**Donald Lee CHILDS, Plaintiff,**

v.

**Jack DUCKWORTH, Warden, Sally Wenzel, Special Services, Robert Bronnenberg, Assistant Warden, Defendants.**

**No. S 80–115.**

United States District Court,
N. D. Indiana,
South Bend Division.

March 24, 1981.

Donald Lee Childs, pro se.

Linley E. Pearson, Atty. Gen. of Indiana, Indianapolis, for defendants.

## MEMORANDUM OPINION

ALLEN SHARP, District Judge.

### I.

In a scene following a visit by Henry VIII to the home of Sir Thomas More, playwriter Robert Bolt puts the following words into the mouths of his characters:

Margaret: Father, that man's bad.

MORE: There is no law against that.

ROPER: There is! God's law!

MORE: Then God can arrest him.

ROPER: Sophistication upon sophistication!

MORE: No, sheer simplicity. The law, Roper, the law. I know what's legal not what's right. And I'll stick to what's legal.

ROPER: Then you set man's law above God's!

MORE: No, far below; but let me draw your attention to a fact—I'm *not* God. The currents and eddies of right and wrong, which you find such plain sailing, I can't navigate. I'm no voyager. But in the thickets of law, oh, there I'm a forester. I doubt if there's a man alive who could follow me there, thank God...

ALICE: (Exasperated, pointing after Rich) While you talk, he's gone!

MORE: And go he should, if he was the Devil himself, until he broke the law!

ROPER: So now you'd give the Devil benefit of law!

MORE: Yes. What would you do? Cut a great road through the law to get after the Devil?

ROPER: I'd cut down every law in England to do that!

MORE: (Roused and excited) Oh? (Advances on Roper) And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws being flat? (He leaves

him) This country's planted thick with laws from coast to coast—man's laws, not God's—and if you cut them down— and you're just the man to do it—d'you really think you would stand upright in the winds that would blow then? (Quietly) Yes, I'd give the Devil benefit of law, for my own safety's sake.

ROPER: I have long suspected this; this is the golden calf; the law's your god.

MORE: (Wearily) Oh, Roper, you're a fool, God's my god... (Rather bitterly) But I find him rather too (Very bitterly) subtle... I don't know where he is nor what he wants.

ROPER: My God wants service, to the end and unremitting; nothing else!

MORE: (Dryly) Are you sure that's God! He sounds like Moloch. But indeed it may be God—And whoever hunts for me, Roper, God or Devil, will find me hiding in the thickets of the law! And I'll hide my daughter with me! Not hoist her up the mainmast of your seagoing principles! They put about too nimbly!

(Exit More. They all look after him).
Pgs. 65–67, *A MAN FOR ALL SEASONS* —A Play in Two Acts, Robert Bolt, Random House, New York, 1960.

This provides an appropriate literary backdrop for the question here presented and the answer here given.

On April 28, 1980 the plaintiff, Donald Lee Childs, a prisoner incarcerated at the Indiana State Prison, filed his complaint *pro se*, pursuant to 42 U.S.C. § 1983, claiming violations of his constitutional rights as secured by the First and Fourteenth Amendments to the Constitution of the United States. He named, as defendants, three prison officials or employees, including Jack Duckworth, the Warden, Robert Bronnenberg, an Assistant Warden responsible for programs, and Sally Wenzel, an employee who was Director of Special Services.

In his complaint, the plaintiff in generalized terms claimed that he had been denied an opportunity to have religious services and engage in other allegedly religious activities like other religious groups. The plaintiff throughout has sought only injunctive and declaratory relief and has not requested damages. The defendants moved to dismiss this case on July 7, 1980. On July 9, 1980 the Court reserved ruling on the defendant's Motion to Dismiss and set this action for trial. A trial on the merits was subsequently held on December 31, 1980.

II.

Under § 1983 it is essential that the plaintiff prove that a defendant deprived him of his constitutional rights under color of state law. *Adickes v. S. H. Kress Co.*, 398 U.S. 144, 90 S.Ct. 1598, 16 L.Ed.2d 142 (1970). Plaintiff now claims to be a member of an organization known as the Church of Satan, Fraternity of the Goat. Yet such an organization, if it exists, has never explicitly been recognized as a religion subject to protection under the First and Fourteenth Amendments.

In *Kennedy v. Meachum*, 382 F.Supp. 996 (D.Wyo.1974), the district court dismissed a complaint, without a trial, brought by several inmates at the Wyoming State Penitentiary who alleged they were adherents of a satanic religion; however the Tenth Circuit reversed the district court in that case. *Kennedy v. Meachum*, 540 F.2d 1057 (10th Cir. 1976). The reversal by the Tenth Circuit in *Kennedy* was primarily based on the fact that the district court had not given the inmates a chance to prove that the practice of a religious belief subject to protection under the Constitution was implicated in the circumstances of that case. Significantly, the Tenth Circuit did not find that the alleged "satanic religion" in *Kennedy* actually amounted to a "religion", given the record. Since the decision in *Kennedy* in 1976 there have been no further reported proceedings in that case. *Kennedy* offers no support for the plaintiff's position in this case. The record herein presents no basis to connect the religious claims in *Kennedy* to this case. There is no basis for determining that the beliefs, if any, held by the Wyoming inmates in the *Kennedy* case

are the same as the alleged beliefs of the plaintiff here.

As *Kennedy v. Meachum* illustrates, the threshold question where a claim arises concerning the free exercise of religion in the prison context is whether the practice of a religious belief is involved; given the standards for making such a determination. *Theriault v. Silber*, 453 F.Supp. 254, aff'd 579 F.2d 302 (5th Cir. 1978) *cert. denied* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 468; *Jones v. Bradley*, 590 F.2d 294 (9th Cir. 1979); *Shabazz v. Barnaukas*, 598 F.2d 345 (5th Cir. 1979); *Church of the New Song v. Establishment of Religion on Taxpayer's Money in the Federal Bureau of Prisons*, 620 F.2d 648 (7th Cir. 1980). In *Jones v. Bradley, supra*, the Ninth Circuit observed that:

> It is clearly impermissible to inquire into the "truth" of religious doctrines or beliefs. *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). There is no prohibition, however, against ruling whether or not a set of beliefs constitutes a religion when deciding if First Amendment protections apply. The district court did not act improperly in reaching the question whether the ULC was a religion.

In support of its reasoning in *Jones*, the Ninth Circuit cited the following passage from the decision of the United States Supreme Court in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972):

> Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious

basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses. (*Jones v. Bradley, supra*, at 295, footnote 2).

Although the Court (Ninth Circuit) in *Jones v. Bradley* did not base its decision on a finding that the alleged organization (the Universal Life Church) was not a religion, as did the district court in that case, the Court did conclude that the reasonable restrictions imposed by the prison authorities did not abridge the inmate's First Amendment rights. *Id.*, at 295–297.

Moreover, it is noteworthy that in deciding that the Universal Life Church was not a religion, the United States District Court for the Eastern District of Washington cited a publication submitted to that court by Jones which declared that:

> The ULC has no traditional doctrine. We, the organization, only believe in that which is RIGHT. Each individual has the privilege and the responsibility to determine what is RIGHT for him—as long as it does not infringe on the RIGHTS of others. The church sells a variety of doctoral degrees to anyone wishing to start a ULC branch. (*Id.*, at 295, footnote 3).

The professed beliefs of the Plaintiff in the instant case are somewhat similar in kind to the concepts of the Universal Life Church, as expressed in the above quoted passage, in that the alleged religion of Plaintiff is apparently very self-centered and free form.

The late Judge John Wood in *Theriault v. Silber, supra*, fully addressed the difficult question as to the existence of a religion and determined that the Church of the New Song was not a religion entitled to First Amendment protections. In making its determination, he stated that:

> As indicated above, the threshold issue before this Court to decide is "whether the beliefs professed by [petitioners] . . . are sincerely held and whether they are, in [their] own scheme of things, religious." See *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d

733 as cited by the Fifth Circuit Court of Appeals in *Theriault* I and II. In the *Seeger* case, involving conscientious objections to war and violence, the test of what was meant by "religious training and belief so as to embrace all religions and to exclude essentially political, sociological or philosophical views" (*Seeger, supra*, at page 165, 85 S.Ct. at page 854) was whether such "belief that is sincere and *meaningful* occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." (*Seeger, supra*, at page 166, 85 S.Ct. at page 854). (Id., at 259).

\* \* \* \* \* \*

The Church of the New Song appears not to be a religion, but rather as a masquerade designed to obtain First Amendment protection for acts which otherwise would be unlawful and/or reasonably disallowed by the various prison authorities but for the attempts which have been and are being made to classify them as "religious" and, therefore, presumably protected by the First Amendment. (Id., at 260).

The Court in *Theriault* found that the inmate in that case was far less than sincere about his alleged religious beliefs. The Court there observed that "the Church of the New Song appears to encourage a relatively non-structured and free-form, do-as-you-please philosophy . . .", despite the fact that Theriault had submitted a number of his written materials, espousing his religious ideas, to the Court and had developed some organizational structures.

Much like *Theriault* and *Jones*, there is a substantial question in this case as to whether the plaintiff has religious beliefs which are sincere and meaningfully occupy a place in his life. Plaintiff's lack of sincerety is shown in a number of ways. For instance, while plaintiff claims to have held his religious beliefs since he was in Boys School (around 1964), the record does not reflect that plaintiff made any request for services, etc. with respect to his alleged religion until 1976. See, Plaintiff's Exhibits 7, 10 and 12. Despite the fact that

considerable detail about an organization, including a sponsor, must be submitted before meetings can be approved by prison authorities, the Plaintiff simply did not submit the required information. The 1976 request was denied primarily because the prison authorities considered the Plaintiff to be less than serious about his request for Satanic services and because of the lack of information given, especially with respect to supervision. Even though Father Murphy allowed Plaintiff to have meetings at the catholic chapel off and on in 1976, he did not think Plaintiff was serious about his requests and felt he was only seeking attention. Plaintiff's Exhibit No. 7.

Another factor demonstrating Plaintiff's lack of seriousness is evident in his failure to follow-up on the denial of his 1976 request for meetings. The Warden's decision had been to hold the request in abeyance pending adequate leadership and supervision. Yet, there is absolutely no indication in the record that Plaintiff even attempted to secure an acceptable sponsor for his group. When, over three (3) years later, the Plaintiff submitted his second request for satanic meetings in November, 1979, he still failed to provide the prison authorities with any meaningful information about the proposed meetings. The requests (Plaintiff's Exhibits Nos. 2 and 11) do not propose a specific sponsor, and, as Mr. Bronnenberg testified, the Plaintiff never told him who the Plaintiff was proposing to be as sponsor for the group.

Furthermore, other than Plaintiff, not one other inmate ever requested that the prison authorities allow satanic meetings, and the prison authorities had no reason to believe that any other inmate actually desired such meetings. It is, of course, a fact that Plaintiff in his requests suggested that other inmates were also interested in satanism. However, the figures cited by Plaintiff are not consistent and reveal a lack of seriousness in the requests. For example, in his memorandum to then Warden Jenkins on August 5, 1976 (Plaintiff's Exhibit No. 12), he suggested that there were 13 members of his group. Yet in his griev-

ance, dated August 20, 1976 (Plaintiff's Exhibit No. 7) he suggested that 26 inmates (exactly twice the number on August 5, 1976) wanted satanic meetings. Then in Plaintiff's letter to Mr. Heyne, dated October 7, 1976, the figure was back to 13. Plaintiff's Exhibit 10. Until the day of the trial in this case, no inmate (other than Plaintiff) suggested they were interested in the satanic meetings that the Plaintiff desired. Even at the trial, the Plaintiff was only able to produce two inmates (Floyd and Sanders) who claimed they were satanists, and their knowledge of their alleged religion was obviously limited and dependent on Plaintiff. Moreover, at the time the prison authorities were making their decisions concerning Plaintiff's request for meetings, not even Sanders and Floyd had come forward.

The very ambiguous nature of Plaintiff's alleged religious beliefs also raises doubts as to the serious and meaningful aspect of his religious claims. In the August 5, 1976, memorandum to then Warden Jenkins, the Plaintiff indicated that he was affiliated with a group in LaVey, California; however, in his letter to Commissioner Heyne, dated October 7, 1976, the Plaintiff claimed that he had been affiliated with a group in Chicago, Illinois since July, 1976. In his requests of November, 1979, the Plaintiff did not indicate that he was affiliated with any satanic group outside of the Prison. The Plaintiff did not show the undated letters that he allegedly received from David D. DePaul to the prison authorities. (Plaintiff's Exhibits Nos. 4 and 6). It is also instructive that the alleged title of the Plaintiff's religious organization changed practically every time it was mentioned in writing. In 1976, Plaintiff indicated the group was called "Thee Satanic Church" and the "Church of Satan." In his November, 1979, requests, the Plaintiff refers to the organization as "The Satanic Brotherhood." Yet, the alleged letters from DePaul refer to an organization called the "Church of the All-Seeing Eye, a branch of the Church of Universal Brotherhood." The DePaul letter (Plaintiff Exhibit No. 4) also refers to the "Fraternity of the Goat."

Finally, the tenets of the Plaintiff's alleged religion are rather ambiguous. He claimed that he adhered to a Satanic Bible, Satanic Rituals and Satanic Laws as published by an Anton Salvadore Lavay, but he did not introduce such material into the record. He claimed candles and incense were required for the practice of his religion. Yet he did not seek permission to order candles and incense for services until May 27, 1980 (Plaintiff's Exhibit No. 3), long after he allegedly became a satanist and after his lawsuit was filed in this Court. Plaintiff's testimony at trial and in his deposition was generally unclear as to required times for meetings, nature of services, etc. which is indicative of the "free form" nature of his religious beliefs. The ambiguous nature of Plaintiff's alleged religion is also indicated by the hodgepodge of ideas mentioned in the DePaul letter, entitled "Fraternity of the Goat." As in *Theriault* and *Jones v. Bradley*, it is doubtful that a religion subject to First Amendment protection is being practiced by Plaintiff.

The plaintiff's alleged religious beliefs are much like the inmate claims in *Brown v. Wainwright*, 419 F.2d 1376 (5th Cir. 1970), and *Brooks v. Wainwright*, 428 F.2d 652 (5th Cir. 1970). See also, *Shabazz v. Barnaukas*, 598 F.2d 345 at 346 (5th Cir. 1979).

### III.

Assuming, arguendo, that Plaintiff's beliefs constitute a religion subject to some constitutional protection, it is nevertheless clear that the various actions taken by prison officials regarding the requests for services and allegedly religious materials were not violative of his First or Fourteenth Amendments rights given the circumstances. Even where the practice of a "clearly recognized religion" is involved, claimed religious rights are not absolute and may be modified where the state has valid reasons for its actions. *McDonald v. Hall*, 579 F.2d 120 (1st Cir. 1978); *Shabazz v. Barnaukas*, 598 F.2d 345 (5th Cir. 1979); *Burgin v. Henderson*, 536 F.2d 501 (2nd Cir. 1976). While it has long been held that the

right of belief is absolute, action under the guise of religion is not totally free from restrictions imposed by government under the First and Fourteenth Amendments. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Since, at least, *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879), it has been clear that an individual's religious belief will not necessarily justify an overt act made criminal by the law of the land. In *Reynolds,* the Supreme Court rejected the defendant's claim that his action of practicing polygamy was protected by the First Amendment in that said practice was enjoined by his religion (Morman).

■ The principle that the State may impose necessary restrictions on the practice of religion beliefs in the prison setting is well established. Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a restriction justified by the considerations underlying our penal system. *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). In *Pell v. Procunier,* the Supreme Court noted that:

> In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law. (*Id.,* 417 U.S. at 822, 94 S.Ct. at 2801).

In *Pell,* the Court held that face to face communication between newsmen and prisoners was not constitutionally mandated, since there were alternative means of communication. Consequently, in *Pell,* prison regulations prohibiting direct contacts were not unconstitutional. Rehabilitation and internal security were among the legitimate penological objectives cited in *Pell.*

In *Cruz v. Beto, supra,* while reversing the summary dismissal of a complaint involving a religious claim (Buddhist), the Court observed that:

> Federal courts sit not to supervise prisons but to enforce the constitutional rights of all "persons," including prisoners. We are not unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations. (*Id.,* 405 U.S. at 321, 92 S.Ct. at 1081).

In a similar fashion, although in a different context (pre-trial detainees), the Supreme Court in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), made it clear that prison administrators must be given wide-ranging deference in the operation of penal institutions, as follows:

> ... the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Jones v. North Carolina Prisoners' Labor Union, supra,* 433 U.S., at 128, 97 S.Ct., at 2539; *Procunier v. Martinez, supra,* 416 U.S. [396] at 404–405, 94 S.Ct. [1800] at 1807–1808 [40 L.Ed.2d 224;] *Cruz v. Beto,* 405 U.S., at 321, 92 S.Ct., at 1081; see *Meachum v. Fano,* 427 U.S. [215] at 228–229, 96 S.Ct. [2532] at 2540–2541 [49 L.Ed.2d 451.] "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier, supra,* 417 U.S., at 827, 94 S.Ct., at 2806. We further observe that on occa-

sion, prison administrators may be "experts" only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislature and Executive Branches of our Government, not the Judicial. *Procunier v. Martinez, supra,* 416 U.S., at 405, 94 S.Ct., at 1807; cf. *Meachum v. Fano, supra,* 427 U.S., at 229, 96 S.Ct. at 2540. With these teachings of our cases in mind, we turn to an examination of the MCC security practices that are alleged to violate the Constitution. (*Id.,* 99 S.Ct. at 1878–1879).

The decision of the Supreme Court in *Jones v. North Carolina Prisoner's Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), cited above in *Bell,* also has particular relevance here. In *Jones,* the Court upheld, as constitutional, prison regulations which: prohibited inmates from soliciting other inmates to join a prisoner's union; barred all union meetings; and disallowed delivery of packets of union publications that had been mailed in bulk to several inmates for redistribution. Significantly, the Court observed that:

> Perhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls. The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution. Equally as obvious, the inmate's "status as a prisoner" and the operational realities of a prison dictate restrictions on the associational rights among inmates. (97 S.Ct., at 2538).

And that:

> First Amendment associational rights, while perhaps more directly implicated by the regulatory prohibitions, likewise must give way to the reasonable considerations of penal management. As already noted, numerous associational rights are necessarily curtailed by the realities of confinement. They may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment. As we noted in *Pell v. Procunier, supra* [417 U.S.], at 823, 94 S.Ct., at 2804, "central to all other corrections goals is the institutional consideration of internal security within the correctional facilities themselves." (97 S.Ct., at 254).

■ As observed previously, while the freedom to believe is absolute, the exercise of religion is not. *Sharp v. Sigler* 408 F.2d 966 (8th Cir. 1969).

A state may restrict religious acts if they pose some substantial threat to public safety, peace and order and where there is a compelling state interest in regulation. *Sherbert v. Verner, supra; Brown v. Peyton,* 437 F.2d 1228 (4th Cir. 1971); *Theriault v. Silber, supra.* The Court in *Theriault* noted that prison authorities have a number of interests which may justify restrictions on First Amendment rights, including:

1. Prison officials have to confine dangerous men in unpleasant circumstances.

2. They must protect the public at large, prison employees and also other prisoners, who are almost totally dependent on the prison for their well being.

3. Prison authorities have a legitimate interest in the rehabilitation of prisoners.

4. The State has an interest in reducing the burden and expense of administration.

(453 F.Supp., at 261).

■ The authorities at the Prison were fully justified in denying Plaintiff's requests for religious meetings or services both in 1976 and the 1979–1980 period. First, the record reveals that only Plaintiff made requests for satanic meetings and absolutely no other inmates indicated to pris-

on authorities that they desired such meetings. Secondly, the requests contained insufficient information concerning the proposed meetings. No proper sponsor was proposed. There is nothing in the record to suggest that Plaintiff even sought a proper sponsor, as required by prison rules. The requests did not describe what would occur at the proposed meetings. The prison authorities were not provided with the necessary information to act affirmatively on Plaintiff's proposal for meetings. Thirdly, the prison authorities did not recognize "satanism" as a religion. The Plaintiff never provided the prison administrators with any material which demonstrated that his alleged beliefs constituted a religion. Plaintiff has not provided such information in this case. Fourth, the prison administrators, while being given little information concerning the plaintiff's specific beliefs, were generally aware that the concept of satanism was associated with an affinity for evil.

Warden Duckworth was familiar with a generalized concept of satanism. The Warden, given his background, including training in theology, felt that the generalized concepts of satanism were inconsistent with the rehabilitative goals of the Indiana Department of Correction or the security of the Prison. The goals are established by the Constitution of the State of Indiana and statutes thereof.

Freedom of religion does not mean freedom to interfere with the peaceful rights of others. *Evans v. Ciccone*, 377 F.2d 4 (8th Cir. 1967). As *Pell, Jones* and *Bell* indicate, prison authorities can limit associational contacts among inmates where legitimate interests such as rehabilitation and security come into play, as in this case. The record does not reveal that there is any proselytizing requirement or tenet involved in plaintiff's alleged beliefs. Compare, *Teterud v. Burns*, 522 F.2d 357 (8th Cir. 1975). The prison administrators certainly were not obligated to permit the plaintiff to solicit other inmates to join in his purported beliefs. *Jones v. North Carolina Prisoner's Union, supra*. Where a denial of a request

for allegedly religious services is neither arbitrary nor unreasonable, as in this case, no violation of the Constitution occurs. *McDonald v. Hall*, 579 F.2d 120 (1st Cir. 1978). In *Cruz v. Beto, supra*, the Supreme Court of the United States stated that:

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty. (92 S.Ct. at 1081, footnote 2.)

Given the circumstances of the requests for services in issue, the denials of those requests for services were clearly reasonable and justified. See, *Theriault v. Silber, supra; Jones v. Bradley, supra*.

Similarly, the denial of plaintiff's request to order candles and incense for use in his cell was justified and consistent with constitutional principles. See, Plaintiff's Exhibit 3. There is some question whether the use of candles and incense is even a tenet of Plaintiff's alleged religion, given the nature and timing of the single request for such materials. No inmate is allowed to possess candles and incense, especially in his cell. The only place candles and incense are permitted in the institution is in the catholic chapel, and the chaplain closely supervises such materials. Candles and incense are not authorized items because they present serious security problems. Candles can result in fires and can be used to make key molds. Incense can be inhaled with a narcotic kind of effect and can be used to mask the odor of homemade alcohol, marijuana, etc. As already noted, overt acts, even in accord with religious convictions or beliefs, may be restricted in proper circumstances. *United States v. Kuch*, 288 F.Supp. 439 (D.D.C.1968). In the equal protection context, prison officials

need only demonstrate a rational basis for their distinctions between organizational groups. *Jones v. North Carolina Prisoner's Labor Union, supra,* 433 U.S. at 134, 97 S.Ct. at 2542. The analysis in *Jones* has clear application to the plaintiff's request for meetings, candles and incense. The Supreme Court in *Jones* stated that:

> It is precisely in matters such as this, the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administrators the full latitude of discretion, unless it can be firmly stated that the two groups are so similar that discretion has been abused. (433 U.S. at 136, 97 S.Ct. at 2543).

The prison authorities could properly distinguish between the supervised use of candles and incense in the chapel and a request for unsupervised use of such items in an inmate's cell. Like the request for services, the request to order candles and incense for use in plaintiff's cell was properly disallowed.

■ Finally, the denial of plaintiff's request to the library staff to obtain books concerning satanism through the inter-library loan procedure presents no basis for relief in this case. See Plaintiff's Exhibit No. 5. The plaintiff testified that the prison has not interfered in his purchase of books relating to satanism, and he indicated he has approximately 200 of these books. There is no reason to believe that the Prison has not fully complied with the dictates of *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The plaintiff also indicated in his testimony that he wanted to use the inter-library loan procedure to obtain extra copies of books. Given this fact, the plaintiff was clearly not denied access to the material in question.

There is no evidence that other inmates have or can obtain materials through the inter-library procedure for use in a religious group, as plaintiff wanted to do. Books are obtained through the inter-library loan procedure for the personal study of an inmate. Generally speaking, the library does not stock titles regarding a certain subject matter when only one inmate expresses an interest in such material. In any event, exact equality is no prerequisite of equal protection of the laws within the Fourteenth Amendment. *Norvell v. State of Illinois,* 373 U.S. 420, 83 S.Ct. 1366, 10 L.Ed.2d 456 (1963). Chief Justice Burger aptly stated in concurring in the decision in *Cruz v. Beto, supra,* that:

> There cannot possibly be any constitutional or legal requirement that the government provide materials for every religion and sect practiced in this diverse country. At most, Buddhist materials cannot be denied to prisoners if someone offers to supply them. (405 U.S. at 323, 92 S.Ct. at 1082).

Given the circumstances, the plaintiff was not deprived of his First and Fourteenth Amendments rights by the decision of certain (non-defendant) prison official to disallow plaintiff's use of the inter-library loan procedure for certain titles, especially when there is some doubt that those titles could have been obtained.

The Devil and his disciples were surely given the benefit of the law at the Indiana State Prison. The rules were applied fairly and evenhandedly. Sir Thomas More certainly never suggested that the law should be bent to favor the Devil. The thickets of law remain standing for all, including this plaintiff, to hide behind.