**Donald Lee CHILDS, Plaintiff-Appellant,**

v.

**Jack DUCKWORTH, Sally Wenzel, and Robert Bronnenberg, Defendants-Appellees.**

No. 81–1496.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1982.

Decided April 20, 1983.

Rehearing and Rehearing En Banc Denied May 26, 1983.

Allen Tuckey (Law Student), Univ. of Chicago Law School, Chicago, Ill., for plaintiff-appellant.

David L. Steiner, Deputy Atty. Gen., Indianapolis, Ind., for defendants-appellees.

Before PELL and CUDAHY, Circuit Judges, and BARTELS,* Senior District Judge.

* The Honorable John R. Bartels, Senior District Judge of the Eastern District of New York, is sitting by designation.

BARTELS, Senior District Judge.

Donald Childs, an inmate at the Indiana State Prison and an alleged member of the satanic church,[1] appeals from an order of the district court for the Northern District of Indiana (South Bend Division) denying him injunctive and declaratory relief under 42 U.S.C. § 1983 against three prison officials who had denied him the right to practice his professed religious beliefs and, in connection therewith, to receive certain religious articles, and from the court's refusal to appoint counsel. The district court held that Childs' beliefs do not constitute a religion entitling them to First Amendment protection, that they were not sincerely held, that the prison authorities were justified in imposing certain restrictions upon Child's practice of his professed beliefs, and finally that the prison authorities acted properly in denying him access to the interlibrary books for group study. Because we affirm on the ground that the restrictions imposed by the prison authorities did not violate his First Amendment rights, we need not address the other issues except the court's refusal to appoint counsel.

## PRIOR PROCEEDINGS

There is little disagreement on the facts in this case. Childs has been incarcerated in correctional institutions since 1964 and at the Indiana State Prison since 1969.[2] He is a self-proclaimed satanist and claims to have become one in 1964. According to Childs he believes in revenge and in the "basic concepts of life" which other orthodox religions consider evil. He also believes man and woman are one, human beings are both God and Satan and Satan rules the earth. He claims his religion has a structure based on degrees and that it is grounded on written religious dogma, including a satanic Bible. He is secretive about his religious practices but does acknowledge burning incense and candles, sacrificing cats and pigeons, and casting spells to retaliate against others.

In the prison Childs has held informal meetings with other inmates at which they have discussed satanism and the occult, and he has procured approximately 200 books on the general topic of satanism. The prison authorities have not interfered either with these informal discussions or with Childs' procurement of reading material on the subject.

In a memorandum to the warden dated August 5, 1976, Childs claimed he belonged to "Thee Satanic Church of LaVey, California,"[3] and he requested permission to start a satanic church at the prison. The warden held his request in abeyance pending Childs' obtaining adequate supervision for the proposed organization. In his appeal of this

---

1. According to The Encyclopedia of American Religions, there appears to be a large number of satanic churches in the United States, and their beliefs and religious practices are quite diverse. Some of these groups are comprised of extremists who commit grisly acts, such as grave robberies and blood letting, but there are other satanic churches, whose theologies, while out-of-the-ordinary, are articulate and considerably more conservative. For example, the oldest of the contemporary satanic cults is Our Lady of Endor Coven. Its belief system derives its primary tenets from early Christian gnosticism. Members believe that there is a god beyond the Christian creator god, and Satanas, the horned god, is his messenger. By studying the message of Satanas, they strive to escape from matter, within which humans are entrapped, and return to the divine, the god beyond. 2 J.G. Melton, The Encyclopedia of American Religions 300–02 (1978).

2. After trial Childs requested and was granted a transfer to the Indiana Reformatory. At oral argument, the attorney for defendants conceded that the issues presented are not moot, in light of Childs' continued presence in the Indiana prison system and the possibility of his return to the Indiana State Prison.

3. The Satanic Church in America, founded in 1966 by one Anton Tszandor LaVey, a former animal trainer and carnival organist, is the best known of the satanic cults. This church, which in 1977 claimed more than 10,000 members, publishes a periodical, appropriately named, The Cloven Hoof, and its founder has authored three religious tracts, The Satanic Bible, The Satanic Rituals and The Compleat Witch, which contain the church's teachings. Of the various satanic cults, this group is one of the least spiritual, for its members worship Satan, not as a supernatural being, but as a symbol of man's self-gratifying animal impulses. Melton, *supra* note 1, at 302–03.

delay to the prison's Action Committee, Childs changed his story somewhat and claimed his affiliation was with "Thee Satanic Church" of Chicago, Illinois.

Three years passed before Childs made a second request. Then, in November, 1979, he requested meetings of an organization called "The Satanic Brotherhood." That request was denied by Assistant Warden Rentschler on November 13, 1979, and on November 25, 1979, Childs submitted the same request to the prison's Special Services, which was denied by Assistant Warden of Programs Bronnenberg on March 11, 1980 and by the prison's Executive Review Committee on March 12, 1980. One reason given for the denial of Childs' requests for services was the lack of a proper sponsor for the group. Indiana State Prison procedures, while allowing additional outside sponsors for some inmate organizations, also require staff sponsors for every organization. The rationale for staff sponsors is that staff know prison rules and they provide continuity for the group's activities. Another reason for denying services for Childs was the prison officials' complete lack of information about the proposed organization. Prison rules require considerable detail about any organization and the mechanics of operating its meetings, including a proposed meeting place and an indication of what activities will occur before a request for a meeting can be approved. In his request for services, Childs failed to provide any meaningful information about his group. Additional reasons prison authorities gave for denial of services included the absence of any other inmates making a request for satanic services, their belief that

satanism was not a religion [4] and that Childs was insincere in his requests, and their determination that the worship of satanism would be contrary to the rehabilitative goals of the Indiana Department of Correction.

In November, 1979, Childs requested certain books on satanism through the interlibrary loan system for the purpose of group study. The director of the prison library denied his request on the ground that books obtained through the interlibrary loan procedure are only for personal use, not group study. Later, Childs was also denied permission by the Assistant Warden of Operations to order a crystal ball on the ground that it could be used as a weapon. On May 27, 1980, Childs made an additional request of the Assistant Warden of Operations to be allowed candles and incense for use in his cell. This last request was denied because candles and incense are only authorized for use under proper supervision in the chapel and are not permitted in any inmate's cell.

In April, 1982, Childs filed his complaint. At that time and once again shortly before trial, he requested counsel, which request was denied on the ground that Childs had a clear understanding of the case. After a one-day trial, the district court dismissed the action.[5]

## I

As previously indicated, we need not reach the question of whether satanism, or more specifically Childs' belief, is a religion, although the prison officials and the district court decided it was not.[6] Rather,

---

**4.** Assistant Warden Bronnenberg stated on March 11, 1980, "Satanism, which you purport to be a religion, is not recognized as such by this institution. The term more aptly describes a rather nebulous, philosophic concept ..." On March 21, 1980 Sally Wenzel, Director of Special Services, informed Childs, "[t]he committee denied your request for recognition of the grounds that it is not a religion."

**5.** *Childs v. Duckworth*, 509 F.Supp. 1254 (N.D. Ind.1981). Upon appeal, Childs seeks a preliminary injunction which he failed to request below. It cannot now be considered. *Stern v.*

*United States Gypsum Inc.*, 547 F.2d 1329, 1333 (7th Cir.1977).

**6.** In determining what is a religion, Chief Justice Burger said, "the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425,

our concern, assuming his belief is a religion, is whether the prison restrictions were such that they unlawfully deprived Childs of his First Amendment right to the free exercise of his religion. In this connection we are mindful that while freedom to believe is absolute, the exercise of religion is not, *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878); *Sharp v. Sigler,* 408 F.2d 966 (8th Cir.1968); *United States v. Kuch,* 288 F.Supp. 439 (D.D.C.1968), and that prison officials may legitimately impose certain restrictions on the practice of religion in prison, including the right of association, which would be unconstitutional if imposed outside the prison. *Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). For instance, in *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125–26, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977), the Supreme Court stated:

> Perhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of the prison walls. The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution. Equally as obvious, the inmate's "status as a prisoner" and the operational realities of a prison dictate restrictions on the associational rights among inmates.

The issue then is whether the restrictions imposed on the exercise by Childs of his professed beliefs were necessary for the operational security of the prison. It has long been held that prison administrators must be given wide-ranging deference in the operation of penal institutions. *Bell v. Wolfish,* 441 U.S. at 547–48, 94 S.Ct. at 2970. Rehabilitation and internal security

have always been among the legitimate policies and goals of the penal system. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 132, 97 S.Ct. at 2541; *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Jones v. Bradley,* 590 F.2d 294, 296 (9th Cir.1979). In *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495, a prison restriction that regulated the media's contact with inmates was unsuccessfully challenged. There the Supreme Court noted:

> We start with the familiar proposition that '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' ... In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.

*Id.* at 822, 94 S.Ct. at 2804 (citations omitted).

While every religious sect or group need not be provided with identical facilities for worship, a prisoner must be afforded "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto,* 405 U.S. at 322, 92 S.Ct. at 1081. What constitutes "a reasonable opportunity" must be evaluated in light of prison officials' interest in security. *Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804; *Jones v. Bradley,* 590 F.2d at 296. Prison restrictions that impinge upon a prisoner's First Amendment right must be carefully scrutinized to ascertain the extent to which they are necessary to effectuate the legitimate policies and goals of the corrections system. The two competing interests—the state's interest in the proper administration of the penal system and the prisoner's interest in his First Amendment right to adhere to the

1430, 67 L.Ed.2d 624 (1981). *See also United States v. Ballard,* 322 U.S. 78, 82, 64 S.Ct. 882, 884, 88 L.Ed. 1148 (1944).

tenets of his faith—must be mutually accommodated. *Dreibelbis v. Marks,* 675 F.2d 579 (3d Cir.1982); *Shabazz v. Barnauskas,* 598 F.2d 345 (5th Cir.1979); *Burgin v. Henderson,* 536 F.2d 501 (2d Cir.1976).

## SERVICES

This brings us to the particular restrictions of which Childs complains. The denial of Childs' request for organized religious services was justified. The rules that regulate all inmate meetings, requiring prisoners to provide the name of a sponsor and information on the organization's proposed activities, are appropriate restrictions narrowly designed to promote the legitimate governmental interest in institutional discipline and security. Childs never provided the information required to start any organization, never obtained a sponsor, and was secretive about his group's rituals. Without the foregoing information required for such meetings, the prison authorities were in the dark about what would happen at the satanic services. Naturally, this presented a potential security threat to the institution.

Moreover, the record reveals that Childs was the only inmate making requests for satanic meetings. There is no requirement for the authorities to provide Childs with a podium from which to propagate his individual beliefs. *See Jones .v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 129, 97 S.Ct. at 2539. As stated by the Supreme Court in *Cruz v. Beto:*

> A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand.

405 U.S. at 322 n. 2, 92 S.Ct. at 1081 n. 2. The authorities also found that Childs was insincere in his professed beliefs. The exercise of beliefs, insincerely held, cannot be

used as a masquerade to hold meetings presumably protected by the First Amendment.[7] *See Int'l Soc'y for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430 (2d Cir.1981); *Theriault v. Carlson,* 495 F.2d 390, 395 (5th Cir.1974), *cert. denied,* 434 U.S. 871, 98ʿ S.Ct. 216, 54 L.Ed.2d 150 (1977); *Theriault v. Silber,* 453 F.Supp. 254, 261 (W.D.Tex.), *aff'd,* 579 F.2d 302 (5th Cir. 1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 468 (1979). Consequently, the authorities quite reasonably refused to accommodate Childs' request for group services.

## RELIGIOUS ARTICLES

Childs complains that he was prevented from using candles and incense in his cell. It is manifest that candles present a fire hazard and can be used to make key molds. It is apparent that incense can be inhaled and used to mask the odor of illegal substances. Consequently, it was a sensible and reasonable precaution for the authorities, in the interest of prison security and the safety of the inmates and staff, to impose supervision on the use of candles and incense in the chapel and to deny inmates their use in individual cells. Similarly, denial of permission for Childs to order a crystal ball because it could be used as a weapon was a legitimate security measure. *See Kennedy v. Meacham,* 540 F.2d 1057 (10th Cir.1976); *Hoggro v. Pontesso,* 456 F.2d 917 (10th Cir.1972).

Childs also complains of the failure of the authorities to permit him to borrow interlibrary books for group study. The interlibrary loan system is a procedure set up only for personal study and not for group use. While this restriction may at first blush seem a little harsh, it must be remembered that Childs was allowed use of the interlibrary loan system for his personal use. Moreover, he already possessed most of the books he requested and merely

---

**7.** Courts generally make two primary inquiries to determine whether a given belief is religious for First Amendment purposes. They examine whether (1) a given belief is "sincerely" and "meaningfully" held by the claimant and (2) it "occupies a place in the life of its possessor parallel to that filled by the Orthodox belief in God." *United States v. Seeger,* 380 U.S. 163, 183, 85 S.Ct. 850, 862, 13 L.Ed.2d 733; *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 440 (2d Cir.1981).

wished to obtain extra copies since he was reluctant to lend his own copies to other inmates. In fact, he had been permitted by the authorities to purchase a personal library of about 200 titles. Childs failed to establish that the refusal to lend him the requested books was in any way related to the practice of his religion. *See Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). Under the circumstances, it cannot be said that the prison authorities' refusal to permit access to the interlibrary loan system deprived Childs of any constitutional rights.

We note that with respect to all of the above religious articles, the prison rules "operate in a neutral fashion" and they were not applied to Childs in a disparate manner. *Bell v. Wolfish,* 441 U.S. at 551, 94 S.Ct. at 2972; *Pell v. Procunier,* 417 U.S. at 828, 94 S.Ct. at 2807. In summary, the prohibitions imposed by the prison authorities were necessary and reasonable for the security of the institution.

## II

Lastly, we turn to the refusal of the district court to appoint counsel for Childs. Recently this court in many similar cases has reviewed the exercise of the district court's discretion in failing to appoint counsel for state prisoners under 42 U.S.C. § 1983. There is little question that the district court may in its discretion, under 28 U.S.C. § 1915(d), appoint counsel to represent an indigent prisoner in a civil rights case. *McKeever v. Israel,* 689 F.2d 1315 (7th Cir.1982). However, the prisoner has no constitutional right to such an appointment unless the denial of proper representation would result in fundamental unfairness impinging upon the prisoner's due process rights or, as we have stated recently in *Merritt v. Faulkner,* 697 F.2d 761, 764 (7th Cir.1983), "the circumstances of a particular case may make the presence of counsel necessary." *See also LaClair v. United States,* 374 F.2d 486 (7th Cir.1967). In denying the appointment of counsel in this case the district court did so on the ground "that Mr. Childs has a fairly clear understanding of what he wants to present here."

It is the recognized duty of the trial court to insure that the claims of a *pro se* client are given a "fair and meaningful consideration," *Madyun v. Thompson,* 657 F.2d 868 (7th Cir.1981), particularly when his First Amendment rights are concerned, and also to give liberal construction to a *pro se* plaintiff's pleadings. *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). In *Maclin v. Freake,* 650 F.2d 885 (7th Cir.1981), we have set forth a variety of factors which should be weighed in determining whether counsel for a *pro se* litigant should be appointed. The threshold question is whether there are merits to the indigent litigant's claim. Even though the claim is not frivolous, it does not follow that the indigent litigant has the right to the appointment of counsel if his chances of success are extremely slim. *Caruth v. Pinkney,* 683 F.2d 1044, 1048 (7th Cir.1982); *Maclin v. Freake,* 650 F.2d at 887; *Ligare v. Harries,* 128 F.2d 582, 583 (7th Cir.1942). Once this threshold is passed, the other factors to be considered are whether: the litigant has the ability to investigate the factual issues in dispute; evidence introduced will be in the form of conflicting testimony, thus requiring the need for cross-examination by an attorney; the litigant is capable of presenting his own case; and the legal and factual issues are complex.

Each case must be decided upon its particular facts and where appointment of counsel has been required, the facts have been quite different from those here presented. *Maclin v. Freake,* 650 F.2d 885, (the prisoner was a paraplegic and could not adequately investigate or try his case); *Manning v. Lockhart,* 623 F.2d 536 (8th Cir.1980), (warden and prison guards were charged with beating the prisoner); *Shields v. Jackson,* 570 F.2d 284 (8th Cir.1978), (action against a police officer who allegedly took the prisoner's property at the time of arrest).

The district court held and the record reveals that Childs was able to present his own case. Most of the facts in the case

were undisputed. The important issues were the nature of Childs' belief, his sincerity, and the justification of the prison restrictions, all of which were within Childs' knowledge. Given Childs' powers of articulation, his case could hardly have been more effectively presented by an attorney. In addition, at the time of the district court's refusal to appoint counsel, it had before it the history of the case and Childs' deposition. We find, therefore, that the court did not abuse its discretion in refusing to appoint counsel for Childs. *See McBride v. Soos,* 594 F.2d 610 (7th Cir.1979); *Hudak v. Curators of University of Missouri,* 586 F.2d 105 (8th Cir.1978), *cert. denied,* 440 U.S. 985, 99 S.Ct. 1799, 60 L.Ed.2d 247 (1979); *Ehrlich v. Van Epp,* 428 F.2d 363 (7th Cir.1970); *Davis v. United States,* 214 F.2d 594 (7th Cir.1954).

## CONCLUSION

We conclude that (1) the restraints imposed by the authorities of the Indiana State Prison upon the practice of the professed beliefs of Childs were reasonable and necessary to obtain legitimate penological objectives and the security of the prison and in no way violated Childs' First and Fourteenth Amendment rights, and (2) the district court did not abuse its discretion in refusing to appoint counsel for Childs. For the reasons stated herein the judgment of the district court is affirmed.

CUDAHY, Circuit Judge, dissenting:

Although I agree that in many respects the prison rules appear on this record to have " 'operate[d] in a neutral fashion.' " *supra* p. 922, in at least one significant area they did not. This becomes clear from an examination of the testimony of Ferdinand Schindler, the prison librarian:

Q. [by Mr. Steiner, the prosecutor] Do you know whether or not he was ever given those books [on Satanism] or those books were ever obtained through inter-library loan?

A. Not through inter-library loan.

Q. Do you know why that was?

A. The reason we did not proceed to get them was because there was a question which I was aware of through the administration from the director of classification and through the two chaplains' offices that previous to his request there was a philosophy and a thinking that this type of reading was not to be allowed within a correctional institution .... Tr. 150

\* \* \* \* \* \*

Q. [by Mr. Childs] You denied me access through the inter-library for Satanism books. Is that for security reasons or personal reasons?

A. Neither.

Q. Well, what's the reason why it was denied?

A. Because, as I mentioned before, there was an administrative saying that this subject matter was not to be studied or implemented within a state institution and the library was not to be used as a means to obtain this type of information.

Q. I mean, is Catholicism and Protestantism studied in the institution?

A. Yes.

Q. Why not Satanism?

A. Because of the type of subject material.

Q. Subject material, consisting of what?

A. Of the philosophy and the tenets that Satanism stands for. Tr. 155–156

Based upon this testimony as well as upon common expectation, it is unrealistic to suggest that the prison authorities dealt with Satanism in the same way as they might approach a non-mainstream but completely accepted faith like Bahaism. Unfortunately, the record is inadequately developed to disclose how significant a role the tenets of Satanism played in its treatment by prison authorities. Nor do we have any record basis for weighing its presumed antisocial thrust against the guarantees of the first amendment. This is a complex question having very broad potential ramifications.

If, as the district court found, Childs' faith is insincere, he may not have first amendment rights to protect. Or the nature of Satanism may be such that the prison authorities are justified under some or most circumstances in treating it restrictively. I am not put off by the concept that a religion fostering anti-social values and attitudes should be handled with circumspection in a prison. But this concept is difficult and complicated and its resolution is fraught with important consequences.

Since I believe that this case involves an evaluation of Satanism in the prison context, and since this is a question of first impression and of considerable potential importance, I would remand this case for appointment of counsel and retrial. Counsel was appointed in this case only on appeal. Appointment of counsel at trial is also required because of the importance and complexity of the constitutional issue. As this court recognized in *Maclin v. Freake,* 650 F.2d 885, 889 (7th Cir.1981), "where the law is not clear, it will often best serve the ends of justice to have both sides of a difficult legal issue presented by those trained in legal analysis." We should not lightly conclude that because of its content, Satanism is to be denied the full protections of the first amendment. Only on an adequate record could we properly reach such a result; and I doubt that such a record can be forthcoming without appointment of counsel. Basically, therefore, we ought to give the Devil his due.

The effort of the majority to dispose of this case on a basis which does not address the fundamental constitutional issue is appropriate only as to some, but not as to all, of Childs' contentions. To the extent and for the reasons indicated, I must respectfully dissent.