Robert James HOWARD, Jr., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 92 N 1515.

United States District Court,
D. Colorado.

Oct. 7, 1994.

Darold W. Killmer, John A. Culver, Feiger, Collison & Killmer, Denver, CO, for plaintiff.

George E. Gill, Asst. U.S. Atty., Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

This case involves a prisoner's right, under the Free Exercise Clause of the First Amendment, to pursue certain religious practices and rituals. Robert James Howard is an inmate at the Federal Correctional Institute at Englewood ("FCI Englewood") in Littleton, Colorado. He is a self-proclaimed Satanist. He brought this lawsuit in a effort to obtain time, space, and implements to perform his religious rituals. Prison officials categorically denied his requests.

In response to plaintiff's request for a hearing, I held a lengthy evidentiary hearing. Upon inquiry at the hearing, I learned that plaintiff wants to prevent the officials at FCI Englewood from enforcing the terms of an administrative policy which wholly prohibits him from practicing his religious rituals. I will therefore treat his request for a hearing as a motion for a preliminary injunction. After considering the evidence before me and the specific, somewhat-unique facts of this case, I conclude that plaintiff is entitled to such an injunction.

## FINDINGS OF FACT

Howard has been incarcerated at FCI Englewood since 1991. He is currently set to be released in 1999. He has been a self-proclaimed Satanist since 1987. (Tr. of Oct. 8 Hr'g at 80.) He is not a card-carrying member of the Church of Satan or any particular sect or splinter group of that church. (Tr. of Oct. 8 Hr'g at 63–64.) He has educated himself in the area of Satanism through reading literature and attending lectures. (Tr. of Oct. 8 Hr'g at 62.) He refers to the writings of Anton LaVey, the founder of the Church of Satan, for guidance. For example, he has personally adopted the Nine Satanic Statements set forth in *The Satanic Bible.* (*See* Def.'s Ex. A at 25.) He was taught about the rituals he is now seeking to perform by another Satanist. (Tr. of Oct. 8 Hr'g at 109.)

On November 25, 1991, plaintiff initially approached Chaplain Ward at FCI Englewood with a request for a place of worship and implements necessary to perform Satanic rituals. (Def.'s Ex. H [Inmate Request to Staff Member].) This request was forwarded to the regional chaplain for the United States Bureau of Prisons. The regional chaplain denied plaintiff's request, stating:

The present practice of the Bureau of Prisons is not to provide chapel time or space for the Church of Satan group to meet. It is the BOP's position that accommodation of this group would pose a threat to the good order and security of the institution. A decision pursuant to this request should be made at the local level pursuant to PS 5360.05, which states that activities are to be limited or denied "when it is considered necessary for security or good order of the institution." However, should inmates request appropriate literature which is neither inflammatory or incendiary for their personal and private use, I do advise that you allow this material to be admitted after your review, if this is consistent with your institution supplement on incoming publications.

An inmate who is dissatisfied with a decision as to activities and practices of a group may appeal through the administrative remedy procedure. I hope this is sufficient response to your recent request.

(Pl.'s Ex. 3 [Memorandum from VanBaalen to Ward of Jan. 14, 1992].) Chaplain Ward conveyed this denial to plaintiff. Instead of pursuing an administrative appeal, plaintiff filed a petition for a writ of mandamus with this court on August 4, 1992. After he acquired counsel, plaintiff filed an amended complaint on January 25, 1993.

Howard is seeking to perform three rituals. He calls them a compassionate ritual, a destruction ritual, and a personal ritual. Plaintiff explained their importance as follows:

[The rituals] serve as a form of dogma, which every man has a piece missing in themselves that they always seek, things that they can't understand, ways to do things that they can't possibly do, and they explain the unexplainable. That fills a void in a Satanist, whose basic life is philosophy, not religion. It fills that void for a few of us, not all, where the things that we

can explain, but we still seek answers for, we go through the rituals to, you know, like going to a shrink, it helps us deal with life.

(Tr. of Oct 8 Hr'g at 65–66.) He testified that he needs to perform a ritual about once a month. The entire process takes about one hour. This includes performing the ritual itself and cleansing the chamber before and after the ritual. The chamber can be very small. Plaintiff merely needs enough room to raise his arms and turn around. He says even a broom closet will do. (Tr. of Oct. 8 Hr'g at 66.) The preferred time for a ritual is between 2 o'clock a.m. and 5 o'clock a.m., although plaintiff appears willing to accept other hours if such hours are required for the security of the institution. The implements necessary for the rituals are candles, candle holders, incense, a gong, a black robe, a chalice, and a short wooden staff or other object suitable for pointing. Such an object could be as small as a pencil. The implements are used as stage props to help him "get in the right mood." (Tr. of Oct. 8 Hr'g at 64–65, 109.)

Howard explained that these rituals are a way for him to direct his energies. The symbolic rituals enable him to work problems out in his mind.

> [T]he compassion ritual, mostly, is what I'm mostly interested in, is to basically for myself, to be able to deal with things that I can't deal with, such as death. I would perform a compassion ritual to release my own energy, and like get it off my chest, like going to a psychiatrist.

> The destruction ritual I would perform when someone has made me so angry that I would actually be able to visualize in my mind their death, and I would think that through to keep myself from actually killing that individual; and a person[al] ritual to handle all things in between, just same basic implements, same basic actions, just different words.

(Tr. of Oct 8 Hr'g at 65.) Therefore, plaintiff asserts that engaging in these rituals allows him to release his anger and actually makes him less violent. (Tr. of Oct. 8 Hr'g at 73, 116.)

Plaintiff also spoke at some length about his beliefs in general. He characterizes his own particular beliefs as follows:

> My religious beliefs and practices are non-violent in nature. I believe in a humanistic ethical system which would never allow for violence, rape, human sacrifice, animal sacrifice, bloodletting or other practices inaccurately ascribed to my practices by the government and the Federal Corrections Institute at Englewood.

(Def.'s Ex. E [Howard Aff. ¶ 9].) He also stated he believes in "the excellence of the human body." (Tr. of Oct. 8 Hr'g at 63.) He vehemently denies wanting to perform any bloodletting rituals or any other violent acts that are against prison rules. (Tr. of Oct. 8 Hr'g at 68, 70.) Plaintiff stressed that he has made many mistakes—one of which landed him in jail—but stated that none of those things were done in the name of the Church of Satan. (Tr. of Oct. 8 Hr'g at 116.) Plaintiff also emphasized the flexibility of his requests. He asked that if a certain implement could not be allowed for any reason, a suitable alternative be substituted. (Tr. of Oct. 8 Hr'g at 83, 86.)

Howard also testified generally concerning what, in his view, are misconceptions about Satanists and Satanism in general. First, he noted that much of LaVey's writing, including *The Satanic Bible* and *The Satanic Rituals,* was done in symbolic language. (Def.'s Exs. A–B.) For example, plaintiff asserts that the references to human sacrifice are symbolic only. (Tr. of Oct 8 Hr'g at 68, 113; Def.'s Ex. A at 88.) Plaintiff also asserted that Satanism is a "religion of reality."

> Our religion, basically, what they do is have you think out all your actions. I, being young, have made a lot of mistakes and I didn't think them through. We're supposed to look at the end result of everything before we do it. Our religion is more intelligence than just, you know, going by the gut feeling. We don't go with the Holy Spirit or anything like that. We go with reality. The reality is there's laws, and we can't just go breaking laws, because then our freedoms will get taken away, and we'll be in court trying to get our religious freedom.

(Tr. of Oct. 8 Hr'g at 68–69.) Therefore, the Church of Satan does not advocate breaking laws. (Tr. of Oct. 8 Hr'g at 73, 112, 115.) Plaintiff also clarified that much of what is written in *The Satanic Bible* and *The Satanic Rituals* applies to large public rituals, not individual rituals of the type he is seeking to perform. (Tr. of Oct. 8 Hr'g at 81.)

## CONCLUSIONS OF LAW

In order to prevail on a motion for preliminary injunction, plaintiff must show that: (1) there is a substantial likelihood that he will prevail on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the threatened injury to him outweighs whatever damage the proposed injury may cause the opposing party; and (4) the injunction, if issued, would not be contrary to the public interest.

*E.g., Seneca–Cayuga Tribe v. State ex. rel Thompson,* 874 F.2d 709, 716 (10th Cir.1989). The primary issue here is whether plaintiff is likely to succeed on the merits. I will therefore focus on this requirement before briefly discussing the others.

### I.  Likelihood of Success on the Merits

■ The United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend I. Plaintiff argues that both these clauses of the First Amendment have been violated by the prison officials' denial of his request (Compl. ¶¶ 28, 43.) The primary thrust of his argument, however, is the Free Exercise Clause.

■ Federal courts have a responsibility to "take cognizance of the valid constitutional claims of prison inmates." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). They must also recognize the latitude accorded to other branches of government in administering the penal system:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison adminis-

tration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Turner,* 482 U.S. at 85, 107 S.Ct. at 2259. Therefore, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261. "[T]he reasonableness inquiry is less restrictive than might otherwise apply" outside of prison. *Mosier v. Maynard,* 937 F.2d 1521, 1525 (10th Cir.1991), *cert. denied,* — U.S. —, 114 S.Ct. 260, 126 L.Ed.2d 212 (1993). This relaxed standard is necessary because of the unique aspects of prison life:

> It is the duty of those charged with the administration of federal prisons to see that prisoners are treated properly, giving due recognition to the fact that rights and privileges which are not constitutionally guaranteed must necessarily be varied in application in order to accommodate the particular needs and exigencies of the penal environment. Prisoners are, by definition, prisoners. Many "in house" regulations and decisions of prison authorities which may be considered as deprivations of "property" or "liberty" under other circumstances and environs, are necessary in order to protect the prisoner, to protect other prisoners, and to operate the institution. Many prisoners are unpredictable. Prison setting is, at best, tense. It is sometimes explosive, and always potentially dangerous. The judgments of prison authorities, under such circumstances, are often predicated on "educated" estimates or guesses resting on suspicion. The overall atmosphere does not blend well with many of the traditional "due process" requirements.

*Marchesani v. McCune,* 531 F.2d 459, 462 (10th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 127, 50 L.Ed.2d 117 (1976).

### Preliminary Determinations

In *Turner,* 482 U.S. at 89–91, 107 S.Ct. at 2262, the Supreme Court directed the lower courts to consider four issues in reaching an accommodation between a prisoner's reli-

gious rights and the operation of a penal institution. Before discussing these considerations, however, I must confront two threshold questions in order to determine whether the protections of the First Amendment even apply. The first question is whether the beliefs which plaintiff professes constitute a religion. "[In order] to have the protection of the Religion Clauses, the claims must be rooted in religious belief." *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). *See also United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). Plaintiff's explication of his beliefs, already discussed, would ordinarily make the question a close one, since certain aspects of his beliefs appear to be "philosophical and personal rather than religious." *Yoder,* 406 U.S. at 216, 92 S.Ct. at 1533. I need not delve into the issue here, however, since the parties agree that plaintiff's beliefs constitute a "religion." Warden Perrill acknowledged that the Bureau of Prisons treats Satanism as a religion (Tr. of Oct. 8 Hr'g at 28), and neither the Government nor the plaintiff raise the issue in the briefs. I will therefore assume on this record that plaintiff's beliefs are conceded to be religious in nature.

The second threshold issue is whether plaintiff's religious beliefs are sincere. The determination of whether an individual is sincere in his beliefs is a factual one. *LaFevers v. Saffle,* 936 F.2d 1117, 1119 (10th Cir.1991) (citing *Frazee v. Illinois Dept. of Employment Sec.,* 489 U.S. 829, 832–33, 109 S.Ct. 1514, 1517, 103 L.Ed.2d 914 [1989]). The Government presents two arguments in an attempt to prove that plaintiff is not a sincere believer in Satanism. First, the Government emphasizes that plaintiff has attended Hare Krishna meetings and other religious ceremonies. (Tr. of Oct. 8 Hr'g at 76.) Plaintiff testified that participating in these other ceremonies enables him to better understand people of other faiths. (Tr. of Oct. 8 Hr'g at 76.) It also has served to make his belief in his own religion stronger. (Tr. of Oct. 8 Hr'g at 77.) Attending other religious services does not prove the insincerity of a professed belief. For example, Chaplain Ward, a Roman Catholic, testified that he has attended numerous religious services of many other faiths. (Tr. of Oct. 8 Hr'g at 120–21.) I do not doubt the sincerity of his belief in the Roman Catholic faith. (Tr. of Oct. 12 Hr'g at 10.) Likewise, plaintiff's attendance at various other religious ceremonies is insufficient for me to conclude that he is insincere in his faith.

Second, the Government points to conflicting representations made by plaintiff as to his religious affiliation. When plaintiff made his request to Chaplain Ward, he directed the chaplain to the Temple of Set for information about the rituals he was seeking to perform. (Def.'s Ex. H.) Plaintiff explains that he was directing the chaplain to an organization, which he knew was a recognized religion, for informational purposes only. *See Mosier,* 937 F.2d at 1523 (membership in religious organization is not prerequisite for sincere religious belief). He was not representing himself as a member of that sect. (Tr. of Oct 8 Hr'g at 63–64.) This strikes me as a plausible explanation. Plaintiff is not an official member of any organized religious group, yet he was trying to convince the prison bureaucracy to allow him to perform his religious rituals. Prison officials sought more information and plaintiff directed them to contact the Temple of Set—a recognized religious organization. This series of events does not convince me that plaintiff is insincere in his professed belief. I therefore conclude that the protections of the First Amendment apply. Having addressed the threshold issues, I will now use the four *Turner* considerations to examine the validity of the Bureau of Prisons policy articulated by Chaplain VanBaalen. (Pl.'s Ex. 3.)

### Turner v. Safley Analysis:

The four questions which a court should ask in order to determine the reasonableness and validity of a prison regulation are as follows: (1) whether there is a valid, rational connection between the prison regulation and the legitimate government interest put forth to justify it; (2) whether there are alternative means of exercising the asserted right that remain open to prison inmates; (3) what impact the accommodation of the asserted constitutional right will have on the allocation of prison resources generally; and

(4) whether there are any ready alternatives that would allow the prisoner to exercise his rights at a minimal cost to the institution. *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2262. "This standard gives corrections officials the necessary leeway to effectively confront the intractable difficulties of administering prison systems while, at the same time, it keeps intrusion of the judiciary into such matters at a minimum." *Clifton v. Craig,* 924 F.2d 182, 184 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).

■ The reasonableness inquiry of *Turner* involves a mixed question of law and fact. *Iron Eyes v. Henry,* 907 F.2d 810, 813 (8th Cir.1990). *See also Mosier,* 937 F.2d at 1525; *Hall v. Bellmon,* 935 F.2d 1106, 1113 (10th Cir.1991); *Friedman v. State of Ariz.,* 912 F.2d 328, 331 (9th Cir.1990), *cert. denied,* 498 U.S. 1100, 111 S.Ct. 996, 112 L.Ed.2d 1079 (1991). Although the *Turner* case specifically dealt only with prison regulations, the Tenth Circuit has applied this test to actions taken by prison officials as well. *Frazier v. Dubois,* 922 F.2d 560, 562 (10th Cir.1990). The broad language of *Turner* also suggests that this test covers a variety of constitutional claims. I will therefore apply this test to the action taken by prison officials in this case in order to resolve plaintiff's claims under both the Free Exercise Clause and the Establishment Clause of the First Amendment. *See Turner,* 482 U.S. at 85–87, 107 S.Ct. at 2260.

### 1. Valid Connection Between Prison Action and Governmental Interest

■ Prisoners clearly retain the right to the protections of the First Amendment, including the free exercise of religion. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 346, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). The right to free exercise of religious beliefs may "be restricted in order to achieve legitimate correctional goals, and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979). "[C]entral to all other correctional goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Other legitimate goals include rehabilitation and deterrence. *Mosier,* 937 F.2d at 1525. However, any regulations which restrict an inmate's first amendment rights in order to further these goals must be content-neutral. *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262.

In this case, Warden Perrill discussed several security concerns. He stressed that the implements requested by plaintiff raised security issues. For example, he testified that candles could be used to set fires, mold dummies for escape attempts, make impressions of keys, plug locks, and mask other smells. (Tr. of Oct. 8 Hr'g at 52.) Incense could also be used to mask smells. (Tr. of Oct 8 Hr'g at 53.) A gong or bells could be disruptive to other inmates. *Id.* The concern with a black robe is the cowl which covers the face and could cause identification problems. (Tr. of Oct. 8 Hr'g at 52.) A staff could be used as a weapon. (Tr. of Oct 8 Hr'g at 54.) All of these are legitimate concerns. The problem is that many of the other religious groups regularly use these very same—allegedly very dangerous—implements. In fact, Howard himself participated in Hare Krishna ceremonies using all of the implements he has requested except the staff and hooded robe. No security problems have occurred because of other inmates' use of these implements. (Tr. of Oct. 12 Hr'g at 10.) The Government has presented no persuasive evidence that Howard presents a greater security risk than any other inmate. (Tr. of Oct. 8 Hr'g at 44.) True, prison officials point to the fact that plaintiff was disciplined when prison officials found razor blades in or near his locker. (*See* Def.'s Ex. D; Tr. of Oct. 8 Hr'g at 69–70.) The significance of this fact is obscure, however, since Warden Perrill clearly testified that his denial of plaintiff's request was not based on plaintiff's prison record. He stated that he would not allow even the best model prisoner to perform such rituals. (Tr. of Oct. 8 Hr'g at 40.)

Another security concern is the possibility of inmate unrest caused by plaintiff's allegedly controversial beliefs. In the judgment of Warden Perrill and Chaplain Ward, allowing plaintiff to perform Satanic rituals is inflammatory and would be abhorrent to other

inmates. (Tr. of Oct. 8 Hr'g at 36, 125.) This could put plaintiff's safety in jeopardy. This argument, although having a certain amount of intuitive appeal, is not supported by one shred of evidence. Plaintiff testified that his beliefs are common knowledge among the prisoners. (Tr. of Oct. 8 Hr'g at 74.) He reads his literature in public and wears his Satanic medallion. Other inmates have expressed curiosity about his beliefs, but apparently no hostility. (Tr. of Oct. 8 Hr'g at 75.) The Government has pointed to no fracas or incident connected to plaintiff's espousal of his creed. I thus find no support in the evidence for justifying the policy at issue by pointing to concerns about inmate unrest or plaintiff's own safety.

Turning from security concerns, the Government next argues that the tenets of Satanism are directly opposed to the rehabilitational goals of prison and seek to turn the policy of FCI Englewood on its head. (Tr. of Oct. 12 Hr'g at 46.) While this might be a proper concern about some of the other types of Satanism discussed in the reported decisions, the facts in this case do not support the Government's argument. The testimony that I have heard and literature which is a part of the evidence here indicate that, in certain key respects, the Satanist doctrines reflect an extreme version of the "eye for an eye, tooth for a tooth" philosophy. (Def.'s Ex. A at 33.) The Government's argument would carry more force if plaintiff advocated a more extreme position, such as the position taken by the plaintiff in *McCorkle v. Johnson*, 881 F.2d 993, 995 (11th Cir.1989), who described drinking blood and eating flesh as part of the rituals he sought to perform. Plaintiff vehemently denies that bloodletting or human sacrifice are part of his beliefs. (Howard Aff. ¶ 9.)

In support of its regulation, the Government cites several appellate cases which upheld prison officials' denials of requests to perform Satanic rituals. Various safety concerns were the predominant reasons. The Eleventh Circuit has held that the beliefs of the Satanists "cannot be tolerated in a prison environment since they pose security threats and are directly contrary to the goals of the institution." *McCorkle*, 881 F.2d at 996

(holding that prison officials correctly denied prisoner access to Satanic books and materials). Similarly, the Seventh Circuit has denied a prisoner the right to conduct Satanic rituals and possess candles and incense in his cell. *Childs v. Duckworth*, 705 F.2d 915, 921 (7th Cir.1983).

I do not question the result in *Childs* or *McCorkle*, for those cases are distinguishable on their facts. In the *Childs* case, plaintiff sought to use candles and incense in his cell. Other religious groups were only allowed to use such articles under supervision in the chapel. *Childs*, 705 F.2d at 921. The plaintiff in *McCorkle* indicated, as I previously stated, that bloodletting and human or animal sacrifice were part of his ritual. *McCorkle*, 881 F.2d at 995. Plaintiff here does not do so. Based on the facts in *Childs* and *McCorkle* cases, the denials of plaintiffs' requests were proper and content-neutral. In this case, plaintiff's requests are very different. His rituals do not include anything that is forbidden by any prison regulation, other than the regulation challenged in this lawsuit. (Tr. of Oct. 12 Hr'g at 39.)

Prison officials have discretion to "anticipate security problems and ... adopt innovative solutions to the intractable problems of prison administration." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2262. The primary problem with the exercise of discretion in this case is that the policy does not appear to be content-neutral. There is a great deal of evidence about the degree of freedom that other groups are accorded with respect to their use of the same, allegedly dangerous, implements—candles and incense—that plaintiff is requesting. Unlike the plaintiffs in many other cases concerning the religious freedom of prisoners, plaintiff here does not seek special treatment. *O'Lone*, 482 U.S. at 353, 107 S.Ct. at 2406 (Muslim inmates seeking special arrangements for Friday worship); *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir.1990) (Muslim inmate seeking special accommodation with regard to way food is served); *Iron Eyes*, 907 F.2d at 815 (Native American inmate seeking exemption to grooming regulation); *Fromer v. Scully*, 874 F.2d 69, 76 (2d Cir.1989) (Orthodox Jew seeking exemption from grooming regula-

tion). He is asking for the same privileges granted to every other religious group. In view of this, I cannot help but conclude that some of the security concerns expressed by prison officials are pretextual. Plaintiff has made a legitimate attack on the validity of connection between the prison regulation and the governmental interest in security at FCI Englewood.

### 2. Alternative Means to Exercise the Right

The second factor examines "the degree to which a regulation impinges upon a prisoner's asserted right" to practice his religion. *Friedman,* 912 F.2d at 332. It is "appropriate to see whether under these regulations [plaintiff] retain[s] the ability to participate in other ... religious ceremonies." *O'Lone,* 482 U.S. at 352, 107 S.Ct. at 2406. Prison officials may still prevail if inmates have other means of religious expression. *Friedman,* 912 F.2d at 332; *Iron Eyes,* 907 F.2d at 815. Here, plaintiff is allowed Satanic literature and a medallion. (Tr. of Oct. 8 Hr'g at 73.) Plaintiff testified that this is not a substitute for performing the rituals which are so valuable to him personally. (Tr. of Oct. 8 Hr'g at 66.) Rituals are a central part of many religious beliefs, and plaintiff's testimony concerning the importance of his rituals is entitled to equal recognition. Plaintiff has not been given a viable alternative for *practicing* his religion.

### 3. Effect of an Accommodation

Scarce prison resources are mentioned as a reason for the inability to accommodate plaintiff's request. The Supreme Court has recognized the limitations put on prisons by the scarcity of their resources.

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of demand.

*Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972). The Government specifically emphasizes the scar-

city of guards at the prison. (Def.'s Ex.L.) Warden Perrill testified that he is understaffed and that accommodating the request of this one inmate would leave other areas of the prison inadequately secured. (Tr. of Oct. 8 Hr'g at 48–50.) This is a proper concern, but once again it seems to be a selective one. Despite staffing limitations, the prison officials were somehow able to accommodate the single Hare Krishna prisoner who wished to perform his religious rites. That prisoner is no longer at FCI Englewood. (Tr. of Oct. 8 Hr'g at 130.) No evidence has been presented to this court to permit the inference that allowing plaintiff to practice his rituals would be more of a drain on prison resources than supervising the ceremonies performed by the one Hare Krishna inmate.

The chaplains and other personnel also oversee religious services. The prison has recently added another chaplain. There are now three chaplains available to supervise the extensive schedule of various religious ceremonies and educational programs. (Tr. of Oct. 8 Hr'g at 130.) In fact, Buddhist, Rastafarian and Hare Krishna ceremonies were added to the religious program while there were only two chaplains at FCI Englewood. (Tr. of Oct. 8 Hr'g at 130.) It appears to me that the religious program now has more resources than ever. Also, volunteers and contractors assist with religious services. For example, a rabbi provides services to FCI Englewood on a contract basis. (Tr. of Oct. 8 Hr'g at 8.)

Plaintiff is requesting a small amount of space—a broom closet will do—and a short amount of time—approximately one hour a month. The Government has not demonstrated that this is an unreasonable request which would adversely affect prison resources. I make this statement partly in view of the rather elaborate accommodations made in some case for many different faiths. These accommodations include the Native American sweat lodge and a kosher food line for Jewish inmates. (Tr. of Oct. 8 Hr'g at 10–11.) The kosher food line is two and one-half to three times more expensive to maintain than the regular food line. (Tr. of Oct. 8 Hr'g at 11.) The Government has not demonstrated to my satisfaction that it has seri-

ously even considered the impact of accommodating plaintiff's request. *See O'Lone*, 482 U.S. at 352–53, 107 S.Ct. at 2406–07; *Mumin v. Phelps*, 857 F.2d 1055, 1057 (5th Cir.1988) (both cases discuss, in detail, the disruption that would be caused by transporting Muslim inmates back to main compound of prison for a Friday afternoon religious ceremony).

### 4. Availability of Alternative Way to Accommodate Rights at Minimal Cost

The Supreme Court characterized this last factor as a way to check that the prison action was not an exaggerated response to a legitimate prison concern. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262.

> This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262.

The record before the court contains no evidence that prison officials have given any consideration at all to any alternatives which would allow plaintiff to practice his religion. The Government has not explained why plaintiff could not simply take the time slot previously allotted to the Hare Krishna inmate for worship. (Tr. of Oct. 8 Hr'g at 131.) The possibility of using an outside contractor or volunteer to supervise plaintiff's rituals was also mentioned at the hearing. In fact, the Government admitted that this would be a "built-in safeguard." (Tr. of Oct. 12 Hr'g at 47.) Apparently, these alternatives were never investigated by the authorities.

Instead, the Government's counsel, in closing argument, suggested that a viable solution would be for plaintiff to simply practice with one of the so-called "alternative" religions that are permitted to worship at FCI Englewood. (Tr. of Oct. 12 Hr'g at 53.) This is not a serious suggestion for solving this problem. This glib remark made by the

Government in response to a serious first amendment claim is disturbing. FCI Englewood provides time and space for religious ceremonies and education for the following faiths: Roman Catholic (in both Spanish and English), Protestant, Native American, Mormon, Buddhist, Jewish, Muslim, Nation of Islam, Rastafarian, Hare Krishna, and Jehovah's Witness. (*See* Pl.'s Ex. 2 [FCI Chapel Schedule as of Nov. 1992].) Yet, the Government claims no accommodation is possible for plaintiff. On this record, it is clear that the prison officials did not try very hard to reach an acceptable compromise with plaintiff, despite the obvious willingness to accommodate many other religions.

> Although the practice of Native American traditional religion may not conform as neatly to those accommodations already provided in a prison setting, that, standing alone, neither renders the claim of a Native American worshipper frivolous nor terminates the responsibility of prison officials to consider some accommodation. Indeed, the fact that prison authorities have made accommodations to other religions should provide some guidance in determining the frivolousness of [plaintiff's] claim.

*McKinney v. Maynard*, 952 F.2d 350, 352–53 (10th Cir.1991). I conclude that there appear to be ways of accommodating plaintiff's request which should be given some serious consideration. My consideration of all four *Turner* factors leads me to conclude that plaintiff has demonstrated a substantial likelihood of success on the merits of his case.

### II. Irreparable Injury

■ Plaintiff clearly will suffer an irreparable injury if the injunction is not granted. The irreparable injury in this case is the deprivation of plaintiff's first amendment rights. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (1973). *See also Longstreth v. Maynard*, 961 F.2d 895, 903 (10th Cir.1992) (granting preliminary injunction in prisoner freedom of religion case), *cert. denied*, —— U.S. ——, 114 S.Ct. 260, 126

L.Ed.2d 212 (1993). Furthermore, plaintiff cannot be made whole through the imposition of money damages. *See Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986) (holding that injunction proper where money damages constitute inadequate recompense).

### III. Prejudice to the Party Opposing the Preliminary Injunction

■ The terms of the injunction give a great deal of discretion to the prison authorities with regard to the administration of this court's order. I therefore find and conclude that the prejudice to the Government is minimal. On the other hand, plaintiff's first amendment rights are allegedly being violated by the enforcement of current prison policy. Upon balancing the interests of each party, I conclude that prejudice to the plaintiff outweighs any possible prejudice to the Government.

### IV. Not Contrary to the Public Interest

■ The First Amendment of the United States Constitution grants each citizen certain fundamental rights. Enforcement of such rights is clearly very much in the public interest. "[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *O'Lone*, 482 U.S. at 347, 107 S.Ct. at 2403 (quoting *Bell*, 441 U.S. at 545, 99 S.Ct. at 1877). I have already found that plaintiff has demonstrated a reasonable possibility of proving that he is being deprived of his first amendment rights. Accordingly, I find that issuance of an injunction in this situation will greatly serve the public interest. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (holding that a preliminary injunction is appropriate in a case where deprivation of first amendment rights of association was found).

### V. Conclusion

I am reluctant to interfere with the judgment of prison officials concerning operation of penal facilities. I am familiar with the scarcity of resources throughout the federal system. I also appreciate the security concerns which are of paramount importance in ensuring the safety of all at FCI Englewood.

Despite all this, I have a grave concern with the record that is currently before the court. I am particularly bothered by the great amount of freedom and resources granted to other religious groups when contrasted with the denial of plaintiff's modest request. This flies in the face of the principle set forth in *Cruz v. Beto* which guaranteed a reasonable opportunity for all prisoners to exercise religious freedom. *Cruz*, 405 U.S. at 322 n. 2, 92 S.Ct. at 1081 n. 2.

The actions of the prison officials here also controvert the doctrine set forth by the Supreme Court in the *Turner* case. "We have found it important to inquire whether prison regulations restricting inmates' first amendment rights operated in a neutral fashion, without regard to the content of the expression." *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. Clearly, plaintiff's somewhat unusual request clearly presented a difficult dilemma for prison officials:

> [I]t is unrealistic to suggest that the prison authorities dealt with Satanism in the same way as they might approach a nonmainstream but completely accepted faith like Bahaism.... Nor do we have any record basis for weighing its presumed anti-social thrust against the guarantees of the first amendment. This is a complex question having very broad potential ramifications....

*Childs*, 705 F.2d at 923 (Cudahy, J., dissenting). The prison officials in this case have, I think, focused on the tenets of the religion itself in denying plaintiff's request, despite their professed concern for scarcity of resources and security. In fact, the warden directly stated that security is an issue because of the content of the religion. (Tr. of Oct. 8 Hr'g at 45.)

Warden Perrill also made a point which particularly concerns me in light of the findings and conclusions stated herein. What will the warden do when every prisoner becomes a religion unto himself? (Tr. of Oct. 8 Hr'g at 60.) This argument gives me pause, particularly since the prison system must work to balance a number of different concerns—the inmates' constitutional rights versus scarce resources coupled with security problems. "When accommodation of an as-

serted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. Accordingly, I emphasize that my ruling does not require prison officials to accommodate every form of Satanism, nor does it necessarily require them to allow each inmate to become a religion unto himself. The record before me demonstrates that the decision to prohibit plaintiff from performing his rituals appears to have been based on the content of plaintiff's beliefs—an unacceptable criteria according to the Supreme Court. I refuse to gloss over the serious first amendment concerns that this raises.

> I am not put off by the concept that a religion fostering anti-social values and attitudes should be handled with circumspection in a prison. But this concept is difficult and complicated and its resolution is fraught with important consequences....
> ... We should not lightly conclude that because of its content, Satanism is to be denied the full protections of the first amendment.... [W]e ought to give the Devil his due.

*Childs*, 705 F.2d at 924 (Cudahy, J., dissenting). I therefore grant plaintiff's request for an injunction.

On the basis of the foregoing findings and conclusions, it is therefore

ORDERED as follows:

1. Plaintiff's motion for preliminary injunction is GRANTED. The officials at FCI Englewood are hereby enjoined from enforcing the administrative policy of the Bureau of Prisons which does not allow time and space to be provided for plaintiff's rituals. This injunction shall remain in effect until this case has been fully adjudicated on its merits.

2. The prison officials at FCI Englewood are also enjoined from utilizing prison resources to provide implements to the other religious groups at the institution unless they also provide plaintiff with the implements he has requested for his religious rituals: candles, candle holders, incense, a gong or bell, a black robe, a chalice, and an object suitable for pointing. If no prison funds are expended on such items, but rather the prisoners themselves or outside groups fund the purchase of such implements, the prison officials shall allow plaintiff to do the same.

3. Nothing in this order shall be construed as preventing the officials at FCI Englewood from placing reasonable time, place, and manner restrictions on the performance of these rituals.

4. Nothing in this order shall be construed as allowing plaintiff to engage in any behavior that violates any other prison regulation.

5. The court will hold a status conference in the case at 4:00 o'clock p.m. on October 21, 1994.