**James Paul DOTY, Plaintiff,**

v.

**Samuel A. LEWIS, et al., Defendants.**

**No. Civ. 93–473 PHX ROS.**

United States District Court,
D. Arizona.

March 2, 1998.

Jason Paul Doty, Florence, AZ, Pro se.

R. Elizabeth Teply, Arizona Attorney Gen-
eral's Office, Phoenix, AZ, for Defendants.

---

## AMENDED ORDER

SILVER, District Judge.

Plaintiff is an inmate presently confined in the highest security unit at the Arizona State Prison Complex located in Florence, Arizona. He has been incarcerated since 1990 and is serving time for burglary and theft.

Plaintiff filed his Complaint requesting a permanent injunction against the Arizona Department of Corrections seeking to prohibit the State from interfering with his constitutional right to exercise his chosen belief system, Satanism. After discovery spanning over two years, Defendants filed a Motion for Summary Judgment. The Court denied it upon finding genuine issues of material fact whether the ban on certain Satanic materials requested by Plaintiff presented the least restrictive means to further the Government's compelling interest in maintaining prison security and safety. The State of Arizona moved for a stay of any further proceedings until the Supreme Court of the United States resolved the constitutionality of the Religious Freedom and Restoration Act ("RFRA"). In June of 1997, the Court declared the Act unconstitutional.[1]

This matter was then set for trial in September of 1997 to determine whether a permanent injunction should be granted in Plaintiff's favor allowing him to possess, for the purpose of exercising his religion, candles, incense, a Baphomet tapestry, the *Satanic Bible* by Anton LaVey and *The Necronomicon* book of magic and spells. After a two-day hearing, the Court upheld the Department of Corrections' restrictions prohibiting Plaintiff from possessing incense and candles. The Court took under advisement whether Plaintiff would be allowed to possess the Baphomet tapestry and the two books. The parties supplemented the record on and after October 31, 1997, and on November 19, 1997, the Court issued a final order completely denying Plaintiff's request for a permanent injunction including possession of the Baphomet tapestry and the two books. The

Court indicated, though not required by Federal Rule of Civil Procedure 65, that an opinion would be issued setting forth the findings of fact and conclusions of law which led the Court to deny the request for a permanent injunction. This is that opinion.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

I. *Governing Legal Principles*

Federal courts have long recognized the valid constitutional claims of prison inmates, including the retention of the right to freedom of religion. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Supreme Court of the United States, however, has consistently reminded the lower federal courts that the judiciary is not well equipped to "deal with the increasingly urgent problems of prison administration and reform." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court stated that managing "a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislature and executive branches of government.... Where a state penal system is involved, federal courts have, as we indicated in *Martinez*, additional reason to accord *deference* to the appropriate prison authorities." *Id.* 482 U.S. at 84 (emphasis added). In *Turner*, the Supreme Court reaffirmed its previous ruling in *Bell*, holding that restrictions of constitutional rights that are a "rational response" to a clear security problem will be upheld. *Turner*, 482 U.S. at 87.

The Supreme Court in *Turner* crafted four factors for analyzing prison regulations which may impinge upon the constitutional rights of prisoners. In the same term the

---

**1.** When the Motion for Summary Judgment was decided, the then-existing Religious Freedom and Restoration Act was applied. The Supreme Court of the United States in *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), held RFRA unconstitutional. This returned the courts to the law existing be-

fore RFRA, which requires that the restriction only be supported by a rational relationship to a legitimate penological need rather than a compelling relationship. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

Supreme Court then applied those four factors to prisoners' allegations that prison officials were restricting the free exercise of their religion. In *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), Muslim prisoners in a New Jersey prison were assigned to minimum security work outside prison walls. They instituted an action in federal court because this assignment completely prevented them from attending Islamic Jumu'ah services which were held each Friday. The prisoners argued that this service was essential to their religion and was one in which all Muslims were required to participate. The prison did not contest the sincerity of the prisoners' beliefs, but contended that it lacked sufficient staff to escort the prisoners to the services and that the services might cause other disruptions in the prison program. Applying the four factors in *Turner*, the Court upheld the restriction.

The first factor was whether there was a valid rational connection between the restriction and a legitimate governmental interest. *Turner*, 482 U.S. at 89. Federal courts have taken different approaches in requiring prison officials to show that a restriction is justified. In *Standing Deer v. Carlson*, 831 F.2d 1525 (9th Cir.1987), the Ninth Circuit upheld a rule that prevented Native Americans from wearing headbands in the dining hall even though prison officials offered no evidence in support of the restriction. The Court adopted this approach because *Shabazz* allowed prison officials to "*anticipate* security problems and adopt innovative solutions." *Shabazz*, 482 U.S. at 349 (emphasis added). The Ninth Circuit stated:

> We do not require that prison officials demonstrate that the prisoners' religious practices are causally related to existing institutional problems.... To ensure that we afford appropriate deference to the judgment of prison officials, we restrict our inquiry to considering whether the challenged regulation is *logically connected* to legitimate penological concerns.

*Standing Deer*, 831 F.2d at 1528. The Ninth Circuit, however, has recognized as well that though prison officials are entitled to deference, they may not advance restrictions based on arbitrary, exaggerated or pretextual reasons. *See Ashelman v. Wawrzaszek*,

111 F.3d 674, 677 (9th Cir.1997); *see also Williams v. Lane*, 851 F.2d 867, 875 (7th Cir.1988).

The second factor considered in *Shabazz* was whether there were alternative means of exercising the right to practice religion. Importantly, the Supreme Court noted that though there were *no* alternative means for Muslim prisoners to attend the Jumu'ah services, they were still able to participate in some religious ceremonies and in prayer and discussion. *Shabazz*, 482 U.S. at 352.

The third test under *Shabazz* considers whether there were practical options available that would allow prisoners to practice their faith without causing unreasonable difficulties for the prison. The Court made clear that the burden was on the prisoner to advance such alternatives.

> We have rejected the notion that prison officials ... have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.

*Shabazz*, 482 U.S. at 350; *Standing Deer*, 831 F.2d at 1529. Federal courts were warned of the "ripple effect" that a proposed accommodation may have on prison life. *Turner*, 482 U.S. at 90.

The final prong of the *Shabazz* test requires a determination of whether there are "obvious easy alternatives to the policy adopted by prison officials." *Shabazz*, 482 U.S. at 353. If the alternatives impose only a *de minimis* burden on prison officials, the restriction may be an exaggerated response.

To state a First Amendment free exercise claim, the prisoner must also establish that the activity in question is "rooted in" a belief that is religious in nature. *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir.1981); *see also United States v. Ward*, 989 F.2d 1015, 1020 (9th Cir.1992) (Poole, J., dissenting) ("It is axiomatic that even the most sincere of beliefs is not entitled to the protection of the Free Exercise clause unless it is rooted in religion."). Concomitantly, a prisoner claiming a free exercise violation must demonstrate "not only that the subject conduct is religiously permitted, but that the conduct is religiously mandated or otherwise so central to the belief that its prohibition would impose

a genuine burden on religious expression." *North Valley Baptist Church v. McMahon,* 696 F.Supp. 518, 531 (E.D.Cal.1988), *aff'd,* 893 F.2d 1139 (9th Cir.1990); *Callahan v. Woods,* 658 F.2d at 683.

## II. Factual Application

### A. Plaintiff's Prison Record

At the permanent injunction hearing Plaintiff presented himself as a pleasant, respectful, and intelligent individual. His prison record and criminal history, however, demonstrated a much darker side to his character. For almost five months prior to the hearing, he had been placed in the highest security unit of the Arizona Department of Corrections prison (Special Management Unit II or "SMU II") because of his violent behavior and disruptive and disrespectful conduct. Significantly, his public risk score was a four and his institutional score was a five. Five denotes the highest risk within the institution. The evidence established that he had thirty-one disciplinary actions reflecting an escalation of violence and aggression each year. Six actions were violent; twelve were for disregarding authority; two were racially motivated and there were many weapons charges. It was particularly noteworthy that a handmade spear approximately three feet long was found in his cell while housed for the past five months in SMU II. Because the security level is very high in this unit, which restricts prisoners' contact with other prisoners to only one hour per day, it was remarkable and troubling to the testifying prison officials that Plaintiff was able to acquire or manufacture this dangerous weapon. Plaintiff, at other times, stealthily managed to hide a razor blade with a needle attached to it, a long sharpened knife, and a metal shank bent at one end and sharpened at the other. His physical violence included fighting in his cell and throwing a burning towel from his cell which caused a major disturbance in the institution. Setting the towel on fire was precipitated by his strong displeasure with mixed racial housing. He refused to be housed with a black inmate. He also had a fight in the potter's closet with another inmate and constantly disregarded the authority of the prison officials, including receiving many tattoos, some of which were Nazi symbols.

Captain Lutz, who worked as an inmate disciplinary appeals officer, testified that rules and orders are required in the prison to avoid chaos which is always imminent, especially in a high security unit and that racial incidents can "kick off a riot real quick." The Warden, Darla Fay Elliott, indicated that Plaintiff's escalation of disruptive and violent behavior indicated that he was "trying to engage other inmates and incite other inmates into engaging in [violent and disruptive] behavior."

### B. Plaintiff's Adherence to Satanism

There was no question that at the time the Complaint was filed and at the hearing, Plaintiff sincerely believed in the principles of Satanism.[2] In 1992, Plaintiff officially designated his religion with the Department of Corrections as Satanism.

He testified that he adhered to the principles of Anton LaVey as set forth in the *Satanic Bible* authored by Mr. LaVey. The book describes an egotistical self-indulgent set of principles and philosophies to guide Satanists' lives. The book does not mandate or revere certain rituals or methods of worship because the fundamental principle is that each Satanist is free to choose his personal self-interested manner of exercising the belief. The book, however, does set forth suggestions for religious ceremonies such as the use of candles and the Baphomet symbol, but there is no mention of incense or the use of the two books during ceremonies. Plaintiff explained that applying the fundamental principle of Satanism, he had *chosen* to use incense and the two books as his personal preference for exercising religious beliefs.

This Court finds that Plaintiff has not met the burden of establishing that any of the implements he has requested are essential to the exercise of his religion. Recently the Ninth Circuit held that to reach the level of a constitutional violation, the interference with Plaintiff's practice of religion "must be more

---

**2.** There was evidence presented that prior to his incarceration he had boasted about sacrificing cows.

than an inconvenience; the burden must be a substantial interference with a tenet or belief that is central to religious doctrine." *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) (quoting *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir.1987) *aff'd sub nom., Hernandez v. C.I.R.*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)).

If prisoners were able to declare and obtain whatever they decided was required and appropriate for the exercise of their particular religion without even a tenuous connection to some principle of their religion, there would be no limits on the active imagination of some prisoners. Such a principle would be inimical to preserving institutional order, safety, and security of the inmates and staff. For example, Pastor Michael Linderman, the Administrator of Pastoral Services for the Department of Corrections, testified that one prisoner had claimed that his religion, "The Jack Daniels Faith," required that he consume a fifth of whiskey each week. Pastor Linderman explained that this was "counter to rehabilitative goals ... and ... safe prison operation." The same conclusion applies to Plaintiff's requests as explained below in Subsection C. What is more, refusing these implements does not completely restrict Plaintiff from exercising his beliefs. *See Shabazz*, 482 U.S. at 350, (Supreme Court found that even though Muslim prisoners were totally unable to participate in the Jumu'ah services they were nonetheless able to exercise their religion).

### C. *Application of the Four Factors to Plaintiff's Requested Items*

Even if this Court were to find that the items requested were essential to the exercise of Plaintiff's religion, he has not met the burden of establishing that restricting these items does not provide a valid rational connection to a legitimate government interest; that there are no alternative means of exercising his religion; that practicing his religion does not cause unreasonable difficulties for the prison; and that the restriction is an exaggerated response to the exercise of his religion.

### 1. *Incense*

Warden Elliott and Pastor Linderman very credibly testified that the use of incense by any prisoner creates serious problems for prison security and safety. Warden Elliott told the Court that "the pungent or heavy odor ... mask[s] the use of illegal drugs or narcotics which are burned" and that Plaintiff would not be allowed to use incense anywhere in the prison because of his "proclivity to give away" property. She was "concerned that he might share [the] incense with others." She distinguished the use of sage/tobacco by Native American inmates because it does not create "as pungent of an odor" as incense and "incense can be crumbled and put on other things, [such as] clothing." This was corroborated by Pastor Linderman who stated:

> [T]he smoke generated by sage, cedar, and sweet grass is a fairly benign smoke that smells like smoke. And it's easily distinguished between sage, cedar smoke, and the smoke generated by, say, marijuana or crack or some other drug. Whereas the odor produced by incense is much stronger and—and may be able to intermingle with the odor presented by burning marijuana to where an individual walking by the room can't tell whether he's smelling incense or any other combination mixed with the incense.

### 2. *Candles*

Both Warden Elliott and Pastor Linderman explained that candles are not allowed and never were allowed in SMU II because of the violent and disruptive nature of all the prisoners housed in this unit. The only religion known to Pastor Linderman which requires the use of candles as an essential tenet is Judaism. Pastor Linderman stated that in his experience there has never been a Jewish prisoner housed in SMU II and, if he was ever placed in SMU II, candles would most likely be prohibited.[3] Possession of candles by Plaintiff was particularly problematic because he had previously been disci-

---

**3.** Pastor Linderman explained that each time a prisoner requests some item of property for the exercise of his/her religion the Pastor engages in substantial research to determine if the religion

exists; if the prisoner is a true believer; whether the item is mandated by the religion and not inimical to prison safety and security.

plined for his involvement in setting a towel on fire.

### 3. *Baphomet tapestry*

The Baphomet symbol is the only object which is arguably an essential tenet of Satanism as defined by Anton LaVey. However, it is not required that the Baphomet symbol be depicted on a cloth tapestry. Prison policy prohibits prisoners from possessing any cloth items while housed in SMU II because of the security and safety concerns they create. The only exception recognized has been a true religious item such as a Native American headband. The concern is that cloth items can be used to make an officer's uniform for the purpose of escaping. Also, the restriction on possession of cloth items inhibits inmates from bartering or trading property which is prohibited. The possession of property by Plaintiff creates heightened administrative problems because he was charged with burning a towel and had attempted an escape from the county jail before his incarceration at the Arizona Department of Corrections.

Warden Elliott explained that the only cloth item presently allowed for religious purposes in SMU II is a Muslim prayer rug which is used under supervision. It was determined to be essential for the exercise of the Muslim religion. Plaintiff admitted that he did not need the tapestry to exercise his religion and would accept a reasonable accommodation allowing him to *draw* the Baphomet symbol on a piece of paper to be placed in his cell for his religious activities.

### 4. *Satanic Bible*

Plaintiff did not establish that the *Satanic Bible* was inextricably intertwined with the exercise of his religion, He admitted that he wanted the book because each time he read it he learned more about Anton LaVey's version of Satanism. Even if Plaintiff had established that restricting the book from him was a substantial burden and interference with his religious beliefs, he has not demonstrated that the restriction is not reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89. Prison regulations "alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Shabazz*, 482 U.S. at 349; *Anderson v. Angelone*, 123 F.3d 1197, 1198 (9th Cir.1997).

The testimony of Pastor Linderman, Captain Lutz, and Warden Elliott demonstrates that the *Satanic Bible* in the hands of Plaintiff presents a serious threat to the safety and security of the prison. The Court adopts Defendants' Findings of Fact submitted on October 31, 1997 at Pages five through ten, Paragraph twenty-one. Additionally, Pastor Linderman and Warden Elliott testified that the Pastor reviews religious books to determine whether the information contained within them is suitable for the prison environment. If the book is inflammatory or of a racially hostile nature, it is viewed as a threat to security and may be completely prohibited from the prison or a particular prisoner may be restricted from possessing it. The passages referenced in Warden Elliott's testimony indicate that Anton LaVey's Satanic religion can be vicious, "expecting that a person would act as any other animal would, having no conscience, [and] taking advantage of the weak without any remorse or concern." The book also "condones human sacrifice." It allows for the disposal of a totally obnoxious and deserving individual. Pastor Linderman describes the book as "advocating retaliation, even above and beyond the old-fashioned eye for an eye, tooth for a tooth." The book describes its philosophies as "blatantly selfish and brutal." Although "[i]t does advocate some homage to the law, . . . it seems that the Satanist is the one who should interpret what the homage is and to what extent it should be."

The book does explain that a Satanist should reconcile his selfish needs with those of other Satanists to allow all Satanists to live in harmony. For example, a sadist is only permitted to harm a masochist because a masochist desires to be hurt. The book does not give direction, however, on how to discern who desires to be hurt. What is more, the book also advocates hurting someone who, in the opinion of the Satanist, *deserves* to be harmed and destroyed. Because a prison creates a haven for the strong to harm, imperil and manipulate the lives of the

weak, the book creates a danger to safety of the prison particularly in SMU II. In the hands of Plaintiff, security is even more endangered. Plaintiff admitted that he had engaged in sacrificing cows and boasted about it. He also admitted that he casts spells on other prisoners in the institution and claimed that he was successful in causing some prisoners to become ill. Although there is no scientific proof of his success, his success rate is irrelevant. If the prisoners, particularly those in the high security unit, become aware of his efforts there might be "an uprising." Plaintiff admitted that he talked to other prisoners about casting spells and that some prisoners might have felt "threatened" by him.

The book also degrades other religions. Pastor Linderman explained that the degrading, specifically of Christianity, may cause "physical confrontations between inmates [to] occur." The Pastor stated, "We have had confrontations over [religious] literature because ... one inmate reads them and he is extremely upset over the—the way that his religion [is presented or] what, somebody [says about his religion]."

Warden Elliott expressed concern that Plaintiff would try to extort or manipulate weaker inmates into doing what he wanted by threatening them with spells. She added that his escalating disciplinary writeups and incitement of others to engage in the same type of behavior created a concern that the book could assist him in becoming "more predatory." She added that he demonstrated that he does not follow the rules and "indeed that's part of the religion, to do just the opposite of what you're supposed to be doing." Finally, she testified that there was a structure in the prison of weaker and stronger inmates and that a philosophy of exploitation of the weak would adversely affect the prison. She stated, "I think that someone who has an inclination to prey upon weak individuals can certainly take advantage of that in a prison setting."

Finally, Plaintiff is an Aryan Satanist and strongly believes in separation of the races. He created a violent incident when a black prisoner was placed in his cell. There are passages in the book tangentially approving of Nazism.

### 5. The Necronomicon

In some respects, The Necronomicon appears as a benign book of magic and myth, but a close reading demonstrates that it discusses sacrifice as a part of worship. Pastor Linderman described it as follows:

A collection of ritualistic ceremonies designed to call up spirits, evil spirits. It talks about sacrificing to them, some—some aspects of worship. And the reason in calling up these demons or spirits is to gain their assistance in effecting a desired result. And one of those desired results indicates harm the life of man. I don't know how you interpret that or how you work that out. I only know the book says that you use these to—to harm the life of man.

And that the book itself, in its own preface, calls itself potentially the most dangerous book in the Western world. So to me that—that throws up a red flag that this book can create a problem in prison. It may not create a problem on the street, but it can definitely create a problem in a prison environment.

The book is more problematic in the hands of Plaintiff because he believes in casting spells. Coupled with the philosophy of a LaVey Aryan Satanist, the concern of the prison officials is that Plaintiff's attitude is, "If I don't get what I want, I will invoke one of the spells of this book, [and] that can be a manipulative tool in the hands of an inmate in order to manipulate other inmates." Warden Elliott expressed the same concern about the book in Plaintiff's possession:

Well, again, I think if Mr. Doty can convince weaker inmates that in fact he is casting spells, that they may be convinced to kowtow or be bulldogged by Mr. Doty in terms of behaving the way he wants them to, or giving him things that he wants them to.

### D. Conclusion

This Court finds that there is a rational reason for prohibiting Plaintiff from possessing the five items listed above; that he has alternative means of exercising his religion; that the restriction does not in any way foreclose him from practicing his religion; and that forcing the prison to provide the

items would adversely affect the resources of the prison at SMU II.[4]

Finally, this regulation is not an exaggerated response to the need. *See Anderson,* 123 F.3d at 1198–99; *Freeman,* 125 F.3d at 736–37; *Jones v. City and County of San Francisco,* 976 F.Supp. 896, 914–15 (N.D.Cal. 1997); *McCorkle v. Johnson,* 881 F.2d 993 (11th Cir.1989) (Stating that Satanic books that encourage and explain violent acts pose substantial threats to prison security and order); *Childs v. Duckworth,* 705 F.2d 915, 921 (7th Cir.1983) (denying a prisoner the right to conduct Satanic rituals and possess candles and incense in his cell); *Dettmer v. Landon,* 799 F.2d 929, 933–34 (4th Cir.1986) (upholding the prohibition of use of candles and incense in a prison setting for the exercise of religious rights). This Court found only one case in which a federal district court granted a permanent injunction allowing a prisoner to practice Satanic rituals. *Howard v. United States,* 864 F.Supp. 1019 (D.Colo. 1994). *Howard,* however, is decidedly different from this case. Prisoner Howard desired to perform rituals in prison requiring implements such as incense and candles. The Colorado Federal District Court recognized the same security concerns proffered by the prison officials here, but found that "other religious groups regularly use these very same—allegedly very dangerous—implements." *Id.* at 1025. In the Special Management Unit II at the Arizona Department of Corrections no prisoner is allowed to use candles or incense. Further, in *Howard,* the prison officials did not attempt to justify the restriction based upon the prisoner's record. Here the foundation for the restrictions imposed on Plaintiff is his prison record.

Accordingly,

· **IT IS HEREBY ORDERED** denying Plaintiff's request for a permanent injunction.

---

4. Warden Elliott explained that SMU I and II have had a staff vacancy rate of around fifteen percent to twenty-two percent during the last five years. If the staff were required to watch one inmate while he engaged in his religious activity for an hour a week as Mr. Doty proposes, Warden Elliott stated that this would mean "[t]hat security that could be doing other types of needed security functions would be called off those functions."