**Rashid A.A. MUMIN, et al.,
Plaintiffs–Appellants,**

v.

**C. Paul PHELPS, et al.,
Defendants–Appellees.**

No. 87–3531
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Oct. 19, 1988.

Rasheed A.A. Mumin, New Orleans, La., pro se.

Norris Henderson, Angola, La., pro se and other plaintiffs-appellants.

Morris S. Hammen, Angola, La., pro se.

Ronald Ailsworth, Angola, La., pro se.

Roderick Wilson, Angola, La., pro se.

Alvin Keller, Angola, La., pro se.

Keenan Temple, Angola, La., pro se.

Jerome Debeau, Angola, La., pro se.

Jerry Francis, Angola, La., pro se.

Mujahid A. Karim, Angola, La., pro se.

Richard Bruce, Wash. Correct. Institution, Angie, La., pro se.

Robert Tregre, Angola, La., pro se.

Dwayne Atkins, Angola, La., pro se.

J. Marvin Montgomery, Asst. Atty. Gen., Baton Rouge, La., for defendants-appellees.

Before RUBIN, GARWOOD, and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiffs-appellants, thirteen Islamic prisoners at the Louisiana penitentiary, appeal the granting of the motion for summary judgment of defendants-appellees, Loui-

siana penitentiary officials.[1] The essential facts are undisputed. Appellants are inmates at the Louisiana State Penitentiary (Angola) located at Angola, Louisiana. The Angola facility is comprised of a main prison compound and a number of "outcamps."[2] Appellants reside at the outcamps, which are located several miles from the main facility. Appellants are adherents of the Islamic religion. One element of this religion is known as the Jumu'ah, a weekly congregational service. According to Islamic doctrine, it must be held every Friday after the sun reaches its zenith and before the afternoon prayer. There is no question that appellants' sincerely held religious beliefs dictate attendance at Jumu'ah. The affidavit of Fahmee Sabree, the Islamic Chaplain at Angola, reflects that Jumu'ah is part of the essential duties and responsibilities of a Muslim.[3]

The present controversy arose when appellants requested to be transported to the main prison compound to attend Jumu'ah. The prison officials denied this request on the grounds that security and work force considerations precluded such an action, and that appellants already had several hours allocated on Fridays for their worship. Appellants exhausted their administrative remedies and thereafter filed this suit, pursuant to 42 U.S.C. § 1983, alleging that the defendant prison officials violated their right to practice their religion. Both parties filed cross-motions for summary judgment. The district court granted the motion of the defendants.

## I. The Legal Test

It is well established that prisoners must be accorded "reasonable opportunities" to exercise their religious freedom guaranteed by the First Amendment. *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 1081, n. 2, 31

L.Ed.2d 263 (1972). However, conflicts have arisen between prisoners' exercise of this right and genuine concerns of day-to-day prison administration. Two recent Supreme Court cases have addressed this issue. In *Turner v. Safley*, — U.S. —, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court declared: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* 107 S.Ct. at 2261. The Court then set forth several factors for determining the reasonableness of prison regulations challenged in this respect. First, there must be a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* 107 S.Ct. at 2262. Second, the governmental objective must be a "legitimate and neutral one."[4] *Id.* Third, courts must consider the impact on guards, other inmates, and the allocation of prison resources that would result from accommodating the asserted right. Finally, courts must examine the available alternatives. *Id.*

In *O'Lone v. Estate of Shabazz*, — U.S. —, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Court applied the *Turner* factors to a case similar to the one at hand. There, Muslim prisoners challenged a prison policy that required minimum security inmates to work outside the main institution, because the requirement forced the prisoners to miss Jumu'ah. *O'Lone*, 107 S.Ct. at 2402–03. The Court upheld this policy, noting that "[w]hile we in no way minimize the central importance of Jumu'ah to [the prisoners], we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end." *Id.* 107 S.Ct. at 2406. The Court noted that all of the *Turner* factors

1. There is apparently some question whether the defendants were sued in their individual or official capacities, and thus whether this suit would be barred by the Eleventh Amendment. *E.g., Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 188 (5th Cir.1986). However, since we find no reversible error in the district court's opinion, we find no need to address this issue.

2. These outcamps house inmates of a lower security classification than the main facility.

3. However, Sabree's affidavit also states that a Muslim who is prevented from attending Jumu'ah for reasons beyond his control is not considered to have sinned under his faith.

4. The Court's focus here was on "content neutrality."

were present. The requirement that some prisoners work outside the main compound was justified by concerns of internal order and security. *O'Lone* 107 S.Ct. at 2405. The policy prohibiting returns during the day was a safeguard against congestion and delays at the main gate, which was a high security risk area. *Id.* The Court also noted that there was no indication that the prisoners were discriminated against because they were Muslims, and that the prisoners were free to observe a number of their religious obligations, had the right to congregate for prayer or discussion at almost all times except working hours, and had an Islamic chaplain with free access to the prison. *Id.* 107 S.Ct. at 2406. Furthermore, the Court observed that "there [were] no obvious, easy alternatives to the policy adopted by [the prison officials]." *Id.* 107 S.Ct. at 2407.

## II. Application to the Present Case

■ The present case is very similar to *O'Lone*, and satisfies all four of the *Turner* criteria. First, there is a legitimate governmental interest justifying the regulation. Prison officials maintain that the penitentiary is without sufficient financial resources or adequate numbers of security personnel to safely transport the inmates from the outcamps to the main prison for the service.[5] Whether these assertions are literally entirely accurate is not controlling, for it is beyond question that the prison authorities could and did reasonably determine that not insignificant additional financial and personnel resources would be required to comply with appellants' request. Also, the inmates would miss a half day of work each Friday, and the affidavits of prison officials reflect that prisoner work is substantially beneficial.[6]

■ Second, the governmental objective is "content neutral." As in *O'Lone*, there is not a shred of evidence that the appellants are being denied any rights because they are Muslims. No other religious group is allowed to be brought into the main prison for its religious service. The regulation applies to all religions on an equal basis. Appellants argue that the fact that inmates are brought into the main camp to donate plasma demonstrates that they were being treated unfairly. However, the plasma donations do not involve religion or any other constitutional right. The plasma donation plan involves inmates of all religions, or of no religion at all. The neutrality of the prison policy is not violated by allowing some inmates to return to the main camp to donate plasma.

The third factor, the consideration of the impact of recognizing appellants' claim on the allocation of prison resources, is also relevant. The Louisiana officials fear, not without reasonable cause, that allowing Muslim inmates to return on Friday would likely open the way for other religious groups, formal or informal, to justifiably make similar claims. Appellants' argument that there are only thirty or so Muslim inmates does not alter the problem. If the prison work schedule must be disrupted to move thirty prisoners, other religions or belief systems could each legitimately demand their own days, thus significantly enhancing the cost in resources and personnel as well as causing additional confusion and disruption in prison administration and scheduling. We further note that other religious denominations set aside days other than Friday for their worship services. Petitioners' second "plasma" argument also falls short. While it is true that prisoners are transported into the main compound to donate plasma, it is also true that prisoners cannot donate plasma every

---

5. Appellants, in challenging this, assert that the peaceful and nonviolent characters of the Muslim inmates would not cause a security burden. Nevertheless, appellants are felons confined in a state penitentiary, and cannot be assumed to be more peaceful than adherents of other religions or belief systems.

6. The Supreme Court has held that the judgment and experience of prison officials in handling their own unique field of expertise is entitled to substantial deference by the courts. *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984).

week.[7] The prison authorities could legitimately conclude that the disruption caused by the weekly requirements of Jumu'ah would materially exceed that caused by plasma donations. Moreover, plasma donations serve other beneficial purposes and do not implicate the comparative rights of other groups. Prison authorities are simply not compelled to allow plasma donations only if they likewise accommodate Jumu'ah.

Finally, this Court must consider the presence of alternatives. The Supreme Court has noted that "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 107 S.Ct. at 2262. Instead, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* Appellants make no such showing here. Appellants have not presented the seemingly possible alternative that each outcamp could have its own Jumu'ah service, which would not require the transportation of the inmates. In fact, they present no alternatives at all. Moreover, the Islamic chaplain, as well as the appellants themselves, admit that while Jumu'ah is part of the essential duties and responsibilities of a Muslim, a Muslim who is prevented from attending Jumu'ah for reasons beyond his control is not considered to have sinned under his faith.[8] Appellants note that under the Quran they must make some effort to attend Jumu'ah. However, according to appellant Mumin, "if after our efforts through this litigation to establish Jumah [*sic*] we are not successful then we will not be punished. But if we make no attempt to follow the commands of Allah, Allah will hold us responsible."

While this Court is in no position to judge whether appellants have fulfilled their religious obligations by prosecuting this suit, we do hold that appellants, under these circumstances, have failed to demonstrate that the district court erred in light of the principles espoused in *Turner* and *O'Lone*. *See also Kahey v. Jones*, 836 F.2d 948, 950–51 (5th Cir.1988). For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

7. The American Red Cross recommends at least a fifty-six-day (eight-week) waiting period between donations of plasma.

8. Appellants' own admission of this mitigates their new allegations that the prison Islamic chaplain is "incompetent."