# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-CP-01693-SCT

*DONNIE RUSSELL*

*v.*

*MISSISSIPPI DEPARTMENT*

*OF CORRECTIONS*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/2/1998 |
| TRIAL JUDGE: | HON. GRAY EVANS |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | PRO SE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JANE L. MAPP |
| | JAMES M. NORRIS |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 04/18/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/9/2002 |

### BEFORE SMITH, P.J., WALLER AND COBB, JJ.

### WALLER, JUSTICE, FOR THE COURT:

¶1. Donnie Russell, an inmate in the custody of the Mississippi Department of Corrections at the Mississippi State Penitentiary in Parchman, appeals from the dismissal of his appeal by the Circuit Court of Sunflower County. He alleges that the constitutional rights afforded to him by the first and fourteenth amendments have been violated by an MDOC policy which mandates that chaplains or volunteers be present during all inmate religious services and that inmates not be allowed to preach. Russell also complains that the MDOC has refused to allow the inmates to receive the sacrament of communion at least once every six weeks, a practice which is allowed by MDOC policies and procedures. We affirm in part and reverse in part the dismissal of Russell's complaint by the Sunflower County Circuit Court and remand this matter for an evidentiary hearing on the issue of the frequency of Communion services.

## FACTS

¶2. Russell filed a "Petition for Order to Show Cause" in the Circuit Court of Sunflower County, alleging that Christian inmates' constitutional rights were being violated because they were not allowed "to practice their belief in the form of Inmate-Led Services." He also claimed that Christian inmates were being discriminated against because communion supplies were not available for purchase at the prison canteen. In supporting documents Russell suggested that the Christian inmates were being discriminated against because the Muslims had inmate-led religious and sacramental services and the Muslims could buy sacramental products at the canteen.

¶3. At an evidentiary hearing, Raymond Langford, the Director of Chaplains at Parchman, testified as follows:

> For some years there had been the practice of allowing offenders to generate and to oversee worship services, but over a period of time there were problems that arose among the offenders as in relationship to who was going to preach, and who was going to preside, what was going to be done, and there was just some general . . . chaos.

Langford also stated that inmate-led services caused security problems.

¶4. In its order denying the motion for an order to show cause, the circuit court stated:

> Petitioners must remember that they are inmates and as such certain restrictions and limitations which are not placed upon citizens in the free world are placed upon them. The Mississippi Department of Corrections provides worship services which these inmates are allowed to participate in and attend. These services are led by clergy and not by the inmates pursuant to Department policy and procedure. The only exception to this rule is when free world volunteers are not available to minister to a particular religious group. Evidently, Petitioners do not fit within this exception.

> The Department of Corrections and Penitentiary officials are given great discretion in implementing policies and procedures to insure the orderly operation of the prison. So long as the policy is rationally related it shall be allowed. Petitioners are not being the denied the opportunity to participate in and attend worship services. They are not being denied freedom of religion. Neither do they have any constitutional right to purchase certain supplies from the canteen. Petitioners have failed to state any claim upon which relief may be granted.

## DISCUSSION

### I. WHETHER THE POLICY AGAINST INMATE-LED RELIGIOUS SERVICES VIOLATES RUSSELL'S CONSTITUTIONAL RIGHTS.

¶5. In his reply brief, Russell states:

> Inmates are not given sufficient opportunity to participate in Christian activities because: (1) inmates at Unit 15-B only have three services a month; (2) Our unit chaplain hurries with services while his wife waits outside in the car. And one by a volunteer who may or may not show up. Albeit "A" custody inmates are allowed to sign up for the Spiritual Life center which is supposed to be once a week. Even then that is subjected to numerous cancellations. Furthermore, the chaplains refuse to advise us

as to who is preaching at the Spiritual Life Center, making it forced inculcation. In addition, the only thing we are allowed to do is s[i]t and listen. They tell us to raise our hands; we raise our hands. They tell us to stand up; we stand up. They tell us to sit down; we sit down, etc. That is not participation. We cannot take part in something i[f] we are not allowed a voice.

¶6. The right to practice one's religious beliefs is a constitutional right protected even during imprisonment. "Restrictions on prisoner religious exercise are constitutionally permitted, but 'must be reasonably related to legitimate penological interests.'" ***Combs v. Corrections Corp. of America***, 977 F. Supp. 799, 802 (W.D. La. 1997). Factors which are relevant in determining whether a prison regulation infringes on an inmate's constitutional rights include (1) whether there is a valid, rational correlation between the regulation and the legitimate governmental interest advanced; (2) whether alternative means of exercising the right are available; and (3) the impact of accommodation on the right on prison staff, other inmates and allocation of prison resources generally. ***Muhammad v. Lynaugh***, 966 F.2d 901, 902 (5th Cir. 1992). "Prisoners enjoy the first amendment's proscription of laws infringing on their ability freely to practice their religion, but, because of both the reality of incarceration and the inherent conflict with various legitimate penological objectives, their constitutional protects are considerably more circumscribed than those of the general public." ***Powell v. Estelle***, 959 F.2d 22, 23 (5th Cir. 1992) (citing ***[Pell v. Procunier](#)***, 417 U.S. 817, 822-23, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974).

¶7. In ***Mumin v. Phelps***, 857 F. 2d 1055, 1055-56 (5th Cir. 1988), the United States Court of Appeals for the Fifth Circuit held that Islamic inmates' constitutional rights to freedom of religion were not violated when the prison officials refused to transport them from an outlying prison facility to the main facility for religious services because the prison officials had a legitimate penological interest in safeguarding against congestion and delays at the main gate of the prison, which was a high security risk area.

¶8. We find that there is no difference between Russell's complaint that inmates are not allowed to lead worship services and the penological interest of keeping order, and the complaint in ***Mumin*** that Muslims were not allowed to attend worship services and the penological interest of keeping traffic down in a high security area. In fact, the ***Mumin*** inmates had a more compelling claim than Russell because they were not able to attend religious services at all, and the Fifth Circuit still found that there was no constitutional violation. Russell *is* able to attend religious services at Parchman on a regular basis, but he complains that they are not to his liking. His preferences as to how religious services are conducted do not rise to a constitutional violation of the freedom to exercise one's religion.

¶9. We find that the MDOC's policy does not violate Russell's constitutional right to equal protection under the Fourteenth Amendment. In ***[Jones v. North Carolina Prisoners' Labor Union, Inc.](#)***, 433 U.S. 119, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977), the United States Supreme Court found that a penological regulation which denied a prisoners' labor union the right to send bulk mail when other groups (Alcoholics Anonymous and the Jaycees) within the prison were allowed to send bulk mail did not violate the prisoners' labor union's right to equal protection:

> [North Carolina] need only demonstrate a rational basis for their distinctions between organizational groups. [Citation omitted.] Here, [North Carolina's] affidavits indicate exactly why Alcoholics Anonymous and the Jaycees have been allowed to operate within the prison. Both were seen as serving a rehabilitative purpose, working in harmony with the goals and desires of the prison administrators, and both had been determined not to pose any threat to the order or security of the

institution.

\* \* \*

. . . It is precisely in matters such as this, the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administrators the full latitude of discretion, unless it can be firmly stated that the two groups are so similar that discretion has been abused. That is surely not the case here. There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.

433 U.S. at 134, 136, 97 S. Ct. at 2542, 2543.

¶10. The MDOC has demonstrated a rational basis -- a reasonable fear that one inmate would obtain authority over other inmates by exercise of spiritual direction -- for its distinctions between Russell's religious group and other religious groups within the prison. As the Supreme Court stated, the Constitution does not require the MDOC to treat all inmate groups alike when there is a threat of institutional disruption.

¶11. We therefore affirm the circuit court's dismissal of the claim pertaining to inmate-led worship services.

### II. WHETHER CHRISTIAN INMATES HAVE A CONSTITUTIONAL RIGHT TO BE ABLE TO ACQUIRE UNLEAVENED BREAD FOR COMMUNION SERVICES.

¶12. Russell claims that his constitutional rights are violated because Christian inmates are unable to acquire unleavened bread, but Muslim inmates may purchase religious supplies at the canteen. He admitted in his brief, however, that grape juice may be substituted for wine, and he does not allege that they do not have any Communion supplies at all. Once again, we find that Russell's preferences as to how Communion services are conducted (unleavened bread vs. leavened bread vs. crackers, etc.) do not rise to the level of constitutional significance.

¶13. We affirm the circuit court's dismissal of the claim relating to access to Communion supplies.

### III. WHETHER MDOC POLICIES AS TO THE FREQUENCY OF COMMUNION SERVICES ARE BEING FOLLOWED.

¶14. What does pose a problem are Russell's allegations that Communion services are not being held pursuant to MDOC policy, i.e., once every sixty days.[1] Especially compelling is the March 3, 2000, Report and Recommendation of United States Magistrate Judge S. Allan Alexander of the United States District Court for the Northern District of Mississippi. Regarding the frequency of conducting Communion services, the Magistrate Judge found:

[W]hile the existing [MDOC] procedures are adequate to protect the plaintiff's constitutional rights, his rights are being violated by the failure to enforce the procedures. The defendants should be ordered to immediately begin providing sacramental opportunities to Christian inmates at least once every sixty days in accordance with MDOC policy.

*Hudson v. Booker*, No. 4:97CVF210-P-A (N.D. Miss. March 3, 2000).

¶15. Russell states in his brief filed on July 12, 2001, that the chaplains do not offer Communion but "once or twice a year." If Communion is offered only once or twice a year, MDOC policies are not being followed.

¶16. We therefore remand this matter for an evidentiary hearing on the frequency with which inmates are offered Communion services.

## CONCLUSION

¶17. We affirm in part and reverse in part the dismissal of Russell's complaint by the Sunflower County Circuit Court and remand this matter for an evidentiary hearing and ruling on the issue of the frequency of Communion services.

¶18. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**SMITH, P.J., COBB, DIAZ AND CARLSON, JJ., CONCUR. PITTMAN, C.J., CONCURS IN PART. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J., McRAE, P.J., AND EASLEY, J.**

**GRAVES, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶19. I dissent from the majority specifically on the point that allowing one religious group to conduct their own religious services while not allowing another religious group to do so appears to violate the equal protection clause of the Constitution.

¶20. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U. S. Const. amend. XIV, § 1. The Clause "does not take from the States all power of classification," *Personnel Adm'r v. Feeney*, 442 U.S. 256, 271, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), but "keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). *See also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (holding that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike").

¶21. I think it is illogical to find that the prohibition against inmates leading their own services serves a legitimate penological interest when it is applied arbitrarily. In other words, if the prison allows members of the Muslim religion to conduct their own services, then the prison should allow members of the Christian faith to conduct their own services. For this reason, I respectfully dissent.

**PITTMAN, C.J., McRAE, P.J., AND EASLEY, J., JOIN THIS OPINION.**

1. This issue was not included in Russell's first administrative complaint, but he did raise the issue at the evidentiary hearing.